## UNITED STATES DISTRICT COURT
### FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

H.P., by and through his Parents and
Guardians, N.P. and S.P.,

      Plaintiffs and Counter-
      Defendants,

     v.

BOARD OF EDUCATION OF OAK PARK
AND RIVER FOREST SCHOOL DISTRICT
200,

      Defendant and Counter-
      Plaintiff.

No. 23 CV 7103

Judge Manish S. Shah

### MEMORANDUM OPINION AND ORDER

Plaintiffs and counter-defendants H.P. and his parents N.P. and S.P. contend that H.P. was denied a free appropriate public education under the Individuals with Disabilities Education Act by defendant and counter-plaintiff Board of Education of Oak Park and River Forest School District 200. H.P. was a student in the district and, through an individualized education program, enrolled in a residential school for students with intellectual and developmental disabilities in Pennsylvania. In 2022, the district told the school that it would not fund H.P.'s education there for the 2023–24 school year, and the school released H.P.'s spot. The parents found a private residential facility in Connecticut and sought the district's approval for it. In June 2023, the district denied the parents' request and instead proposed changing H.P.'s placement from a residential level to a day-school level. The parents requested a due process hearing challenging the district's proposal to change H.P.'s placement to a

day-school level. They also filed a complaint in this court to order the district to keep H.P. at the Connecticut facility pending the outcome of an administrative hearing on the district's decision. After the administrative hearing, the hearing officer ruled in favor of the parents, finding that the district denied H.P. a free appropriate public education and that the parents' placement was appropriate. He ordered the district to pay for costs relating to H.P.'s placement, among other things. The school district appealed through a counterclaim and motion for summary judgment in this case. For the reasons discussed below, the hearing officer's decision is reversed.

## I. Legal Standards

Under the Individuals with Disabilities Education Act, "[c]ross-motions for summary judgment are the standard method for presenting a case to a district court for decision on the record compiled by the administrative tribunal that the court is reviewing." *Dale M. ex rel. Alice M. v. Bd. of Educ. of Bradley-Bourbonnais High Sch. Dist. No. 307*, 237 F.3d 813, 816 (7th Cir. 2001). A district court "shall" (1) receive the records of the administrative proceedings, (2) hear additional evidence at the request of a party, and (3) grant such relief as the court determines is appropriate, based on the preponderance of the evidence. 20 U.S.C. § 1415(i)(2)(c). Despite the word "shall," I have the discretion to admit additional evidence to supplement the record. *Bd. of Educ. of Tp. High Sch. Dist. No. 211 v. Ross*, 486 F.3d 267, 270 (7th Cir. 2007). Where a district court "reviews only that evidence that was before the administrative tribunal," a summary judgment motion is "simply the procedural vehicle for asking the judge to decide the case on the basis of the administrative record." *M.B. ex rel.*

*Berns v. Hamilton Se. Schs.*, 668 F.3d 851, 860 (7th Cir. 2011) (quoting *Todd v. Duneland Sch. Corp.*, 299 F.3d 899, 904 (7th Cir. 2002)). I review legal issues de novo. *Id.* I give "due weight" to the factual determinations of the administrative tribunal; this review is "equivalent to a 'clear-error' or 'substantial-evidence' standard." *Id.* (quoting *Sch. Dist. of Wis. Dells v. Z.S.*, 295 F.3d 671, 675 (7th Cir. 2002)). The party challenging the outcome of the administrative proceeding bears the burden of proof. *Id.*

## II.    Background

H.P. was an enrolled student in the Oak Park and River Forest School District 200 in Oak Park, Illinois. [97] ¶ 4; [101] ¶¶ 1–2.[1] N.P. and S.P. are his parents. [97] ¶ 5; [101] ¶ 1. As a child, H.P. experienced seizures and was diagnosed with aphasia following epilepsy. [101] ¶ 5. He was also diagnosed with an intellectual disability and found to have features of autism spectrum disorder. [101] ¶ 5. He was later diagnosed with Landau-Kleffner Syndrome, a neurological condition that presents in childhood with a loss of expressive and receptive language. [101] ¶ 5. This caused him

---

[1] Bracketed numbers refer to entries on the district court docket and page numbers refer to the CM/ECF header placed at the top of filings. In the case of citations to depositions, I also use the deposition transcript's original page numbers. The facts are largely taken from the parties' responses to their adversary's Local Rule 56.1 statement of facts, [97], [101], and [110] (where the assertion and response are set forth in one document), and the hearing officer's decision, [55-1] at 1–34. Any asserted fact that is not controverted by reference to specific, admissible evidence is deemed admitted. N.D. Ill. Local R. 56.1(e)(3); *see Cracco v. Vitran Exp., Inc.*, 559 F.3d 625, 632 (7th Cir. 2009). I disregard legal arguments in the statement of facts. *See Cady v. Sheahan*, 467 F.3d 1057, 1060–61 (7th Cir. 2006). The parties dispute many facts, but the facts in those disputes are not all material. To the extent disputed facts are relevant and the parties rely on admissible evidence, I include both sides' versions.

to have delays in his language development. [101] ¶ 5. H.P. was initially enrolled in public elementary school, and then later homeschooled. [101] ¶ 6.

When he was in sixth grade, H.P. received an individualized education program that placed him at a therapeutic day-school level. [97] ¶ 9; [101] ¶ 7. In the fall of 2015, H.P. matriculated to Oak Park and River Forest School District 200. [97] ¶ 7; [101] ¶ 7. The district maintained his placement at the therapeutic day school until 2018, when H.P.'s parents became concerned about that placement. [97] ¶ 10; [101] ¶¶ 7, 9. The parents hired Dr. Colin Brietzke, a licensed clinical psychologist, to evaluate H.P. [101] ¶ 10. In his report, Brietzke observed that H.P.'s cognition, processing speed index, fluid reasoning, and working memory abilities all fell into the "impaired" range of scores. [101] ¶ 12. Because H.P. also had a pro-social nature, did not have repetitive behaviors, and did not have fixated interests or abnormal sensory sensitivities, Brietzke opined that H.P. did not meet the criteria for autism. [101] ¶ 13. He found that H.P.'s diagnosis more accurately reflected Landau-Kleffner Syndrome, as well as a moderate intellectual disability. [101] ¶ 13. Brietzke noted that H.P. required significant repetition and practice to generalize skills and opined that no amount of modification of H.P.'s then-current day-school placement could render it an appropriate setting for H.P.'s educational needs. [101] ¶¶ 14–15. The parents shared the report with the district. [101] ¶ 11. H.P.'s IEP team unanimously agreed to change H.P.'s placement to residential. [101] ¶ 16. He was enrolled at the Camphill School, a private residential special education school in Pennsylvania that is approved by the Illinois State Board of Education. [97] ¶ 13; [101] ¶ 16.

4

H.P. made progress while at Camphill. [97] ¶ 17; [101] ¶ 20. H.P. initially received speech therapy at Camphill, but his parents discontinued it because they did not think H.P.'s sessions with the Camphill speech therapist were productive. [97] ¶ 16; [101] ¶ 21; [110] ¶ 5. The parents considered whether to move H.P. to a more suburban environment, like Oak Park, but in the spring of 2020 when the COVID-19 pandemic broke out, the parents opted to keep H.P. at Camphill. [101] ¶¶ 25–27. H.P. shifted from Camphill's K–12 program to its transition program. [101] ¶ 27.

On July 28, 2021, the State of Illinois passed a statute that extended special education services for students. [101] ¶ 28; 105 ILCS 5/14-1.02. Before, students would lose access to services on their twenty-second birthday. [101] ¶ 28. Now, students are eligible until their twenty-second birthday, unless their twenty-second birthday "occurs during the school year, in which case he or she is eligible for such services through the end of the school year." [101] ¶ 28; 105 ILCS 5/14-1.02. The district, based on the Illinois State Board of Education's guidance, interpreted the law to mean that a student's twenty-second birthday must fall after the start date of the *serving school*, not the district, for the student to be eligible for services through the end of the school year. [97] ¶ 14; [101] ¶ 29. H.P.'s twenty-second birthday fell after the OPRF 2023–24 school year began, but before Camphill's school year began. [97] ¶ 14. Because H.P.'s birthday fell before Camphill's start date, the district told the parents and Camphill that H.P. would not be eligible for services under the new bill. [101] ¶¶ 29, 33. Camphill released H.P.'s seat for the 2023–24 school year. [101] ¶ 33.

5

In January 2022, the district conducted a required triennial reevaluation of H.P. and reconfirmed his eligibility for residential placement. [101] ¶ 30. The parents began searching for a new school for H.P., and believed a facility called Vista Life Innovations could be a good placement option. [101] ¶ 36. Vista Life was accredited by the National Commission for the Accreditation of Special Education Services. [101] ¶ 37. It operated a residential transition program that was approved by the state of Connecticut as a transition program for special education services. [101] ¶ 37. The program allowed students to practice life skills in a naturally occurring environment. [101] ¶ 38. It did not use Applied Behavior Analysis techniques or a points-based reinforcement system. [101] ¶ 39. Vista Life was a 365-day-a-year facility where students participated in about fifty-five hours of weekly programming and additional recreational activities after hours. [101] ¶ 40.

H.P. and his parents visited Vista Life in the summer of 2022, where H.P. underwent a functional skills evaluation. [101] ¶ 41; [55-7] at 55. After the visit, Vista Life told H.P.'s parents that if he were to attend, H.P. would need a 1:1 aide to support him as he learned new routines and expectations during the transition period. [101] ¶ 41. In the fall of 2022, Vista Life formally accepted H.P. for the 2023–24 school year. [101] ¶ 42. Around this time, the district learned that the parents were looking at Vista Life as a placement for H.P. for the 2023–24 school year. [101] ¶ 43.[2] N.P.

---

[2] The parties dispute whether the district told the family that they should look for other facilities that would start before H.P.'s twenty-second birthday. [101] ¶¶ 34, 43. The only relevant portion of this dispute is that both sides agree that the district did not itself look for any residential placement for H.P. [101] ¶ 35.

testified that the district told him he would need to explore residential options approved by the Illinois State Board of Education to see whether those programs had space for H.P. [101] ¶ 43. The district denies this but does admit that N.P. told the district that he intended to hire an education consulting firm, Proficio Consulting, to help review ISBE-approved residential transition facilities. [101] ¶ 44; [97] ¶ 15. The district gave N.P. a spreadsheet of ISBE-approved facilities that serve students with intellectual disabilities and autism. [101] ¶ 45. The parents paid $3,500 for Proficio to research and contact the district's list of ISBE-approved schools to gauge their availability and appropriateness for H.P. [101] ¶ 46.

In March 2023, H.P.'s IEP team met. [101] ¶ 47. It discussed H.P.'s upcoming departure from Camphill in July. [101] ¶ 47; [97] ¶ 18. H.P.'s IEP team continued to recommend residential placement, and there was no discussion of changing H.P.'s placement level, including to the district's day-school transition program, Community Integration Transition Education. [97] ¶ 18; [101] ¶ 48. At the meeting, Camphill staff reported that H.P. was able to participate in daily routine activities, was a strong reader, was skilled in adding and subtracting single digit numbers, had a strong understanding of safety signs and situations, and had acquired farming, hard, and soft skills. [97] ¶ 17.[3] The IEP reflected that at Camphill, H.P. often needed prompts and assistance from staff to complete assignments and activities. [110] ¶¶ 8(i), (v), (vi); [55-4] at 85; [55-10] at 235–36 (63:13–16, 65:10–66:4). Camphill staff reported

---

[3] The parents' response does not contradict the asserted fact, and makes arguments based on inferences that can be drawn from this fact. [97] ¶ 17.

7

H.P. was almost independent with daily self-help skills such as serving himself food, eating, dressing himself, showering, and using the bathroom. [97] ¶ 17.

Camphill staff also observed certain limitations on H.P.'s abilities. H.P. "helps with cooking" by stirring and cutting ingredients. [55-4] at 86.[4] H.P. also helped set the table "provided minimal guidance," needed "some guidance when rinsing dishes as he can sometimes spend up to 5 minutes rinsing one dish," required verbal guidance when serving himself food to not overeat, needed a timer when showering to remind him when to leave and prompting to use shampoo and soap and scrub for thoroughness, needed reminders to wash his hands thoroughly after using the bathroom, needed to be told when to stop brushing his teeth, and needed occasional reminders to put on another layer for cold weather. [55-4] at 86; [110] ¶¶ 9(ii)–(viii).[5] When H.P. had a hard time communicating, he would clap, snap, talk to himself, talk into space, or hit his chest. [110] ¶ 9(ix). Although social in nature, he sometimes struggled with social boundaries. [110] ¶ 9(x); [55-4] at 86.

H.P.'s house mother at Camphill reported that he "independently takes cares of his belongings (e.g. does his laundry, cleans his room, etc.), helps with household chores, runs small errands ("e.g. dumping the compost, and getting yogurt/eggs from the campus walk-in fridge"), and is "almost independent with all his daily self-help skills." [55-4] at 86. At the due process hearing, Camphill's Program Administrator

---

[4] The district admits that the IEP does not "explicitly state" that H.P. "cooks," but disputes that H.P. only helped with cooking by stirring and cutting. [110] ¶ 9(i). This does not contradict the asserted fact.

[5] Again, the district admits that the IEP reflects this, but disputes that the prompts needed to happen consistently. [110] ¶ 9(ii), (iii), (iv), (v), (vii).

testified that H.P. could do "short tasks," like learning "where the garbage receptacle" was with "peripheral supervision," but needed supervision for more multi-stepped tasks. [55-10] at 225 (22:6 to 16). She also testified, contrary to the house mother's report, that if H.P. were alone in his own apartment, he would not be able to do the "self-help skills" without the level of support provided at Camphill. [55-10] at 237 (72:12 to 22).

Soon after the March 2023 IEP meeting, the district provided Proficio with forms the district completed in connection with H.P.'s most recent application for approval of residential placement at Camphill. [110] ¶ 7. Meanwhile, the parents, through Proficio, determined that none of the ISBE-approved schools either had space available for H.P. or could meet his needs. [101] ¶ 49.

In April 2023, the parents once again hired a doctor to perform a neuropsychological evaluation of H.P. [101] ¶ 50; [97] ¶ 18. This doctor, Dr. Rachel Kornacker, worked in the same office as Dr. Brietzke, who had previously evaluated H.P. [101] ¶ 50. Kornacker's report concluded that H.P.'s moderate disability and language-based challenges were best understood as Landau-Kleffner Syndrome, and aphasia following epilepsy. [97] ¶ 25; [101] ¶ 51. The report showed H.P. had a full-scale IQ score of 55, which is in the "impaired" range, his verbal comprehension, working memory, and processing speeds were in the "impaired" range, his perceptual reasoning skills were in the "borderline" range, and his adaptive function was in the "low" range. [97] ¶ 24; [101] ¶ 52; [110] ¶¶ 3, 16. The report noted that H.P. had made significant progress in his adaptive functioning skills, and his perseverance on tasks

had improved, though he still struggled with language delays, needed consistent redirection, usually required prompting to engage in organization, and struggled to maintain attention when not motivated. [97] ¶ 24; [110] ¶ 15. Kornacker found that with continued support, H.P. had the capacity to engage in meaningful activities. [97] ¶ 25. Kornacker's report noted that H.P. could navigate around a residential campus independently, but because it was a controlled environment it was difficult to truly assess H.P.'s visuospatial abilities. [97] ¶ 25. Kornacker did not make an educational placement recommendation. [97] ¶ 25; [101] ¶ 52; [110] ¶ 4. The parents shared Kornacker's report with the district. [97] ¶ 19; [101] ¶ 54. The district did not conduct its own evaluation of H.P. [101] ¶ 54. The district says this is because it could not get the necessary consent from the parents to do so. [101] ¶ 54.

In May 2023, the parents asked the district for an emergency and student-specific residential placement. [97] ¶ 19; [101] ¶ 55. The parents sought to designate H.P.'s residential placement at Vista Life and did not request a placement level change. [97] ¶ 19; [101] ¶ 55. The parents turned over Proficio's spreadsheet that showed its good faith effort to find an ISBE-approved facility for H.P. [101] ¶ 56.

In June, the district conducted another IEP team meeting to discuss the parents' emergency and student-specific residential placement request and Dr. Kornacker's report. [97] ¶¶ 21, 24; [101] ¶ 57. At the meeting, the district's psychologist who had reviewed Kornacker's report acknowledged the conclusions in it were similar to Brietzke's conclusions. [101] ¶ 58. In the IEP documentation, H.P.'s "present levels of functional/developmental performance" was copied from the March

10

IEP. [101] ¶ 59. H.P.'s house parent from Camphill spoke at the meeting and said that there had not been any big changes for H.P. [101] ¶ 60. The house parent was the only representative from Camphill at the meeting; at other IEP meetings, at least three Camphill staff members had attended. [101] ¶ 60. The parents reiterated that the eventual goal was for H.P. to live in Oak Park and participate in an adult day program. [97] ¶ 22.

The IEP team declined the parents' request for emergency and student-specific residential placement at Vista Life. [101] ¶ 61. It found that Vista Life was not appropriate because it was not the least restrictive environment in which H.P. could receive a free appropriate public education, it was not ISBE-approved, and it lacked licensed special education staff, related service providers, and related services and supports, especially speech therapy. [97] ¶ 27; [55-4] at 147–48.[6]

The team expressed concern about H.P.'s ability to practice generalizing his skills in the Oak Park community. [97] ¶ 27. The team also expressed concerns about the restrictiveness of residential placement. [55-4] at 147. The district team proposed that H.P.'s placement change from residential to the district's day-school level Community Integration Transition Education program and scheduled another IEP meeting in August to decide whether to change H.P.'s placement. [97] ¶¶ 26, 28; [101] ¶ 61. The district agreed it would move forward and consider an additional year of

---

[6] H.P.'s parents note that at least one of H.P.'s instructors at Vista Life was special-education certified and that while Vista Life does not itself offer speech therapy services, it would facilitate the provision of those services by an outside speech-language pathologist. [101] ¶ 38; [55-10] at 247 (109:18–110:19). The district disputes whether Vista Life could provide this service, and notes that no evidence was provided that it had done so for H.P. or any other student. [110] ¶ 14.

funding for H.P. [97] ¶ 21; [101] ¶ 65. After the meeting ended, the district wrote to Camphill to ask if H.P. could stay another year. [101] ¶ 66. Camphill told the district that they no longer had space for H.P. [101] ¶ 66.

On June 15, the parents requested a due process hearing and provided notice that they would be unilaterally placing H.P. at Vista Life sometime in July. [97] ¶¶ 29–30; [101] ¶ 67.

In July, Camphill's Program Administrator provided a letter which urged that H.P. "continue to be provided with FAPE in a setting that closely resembles the level of educational support that he currently receives otherwise he will regress in his skill set; negatively impacting his post-secondary transition outcomes." [55-7] at 52; [101] ¶ 68. The letter emphasized that "[r]ound the clock consistent staffing and minimized transitions between work, home, and school are essential in creating continuity, consistency and easing confusion and anxiety over constant change." [55-7] at 52. The letter explained that when H.P. does not receive "adequate support in a familiar environment his off-task perseverations increase and affect his ability to learn, regulate his emotions, and stay focused." [55-7] at 52. Finally, the letter stressed that it is "essential" that H.P. have access to a "similar type of educational environment to what [he] currently receives in a residential school setting," and that his needs "can only be met in a program that will provide continuous 24/7 care in order to maintain his personal safety and to be able to continue making progress towards his goals." [55-7] at 52.

H.P.'s parents moved him from Camphill to Vista Life at the end of July. [101] ¶ 69. They filed a motion at the administrative level to enforce statutory stay-put placement, arguing that Vista Life was H.P.'s stay-put placement. [97] ¶ 31. The hearing officer denied the parents' motion and ordered the district to find a residential facility to implement H.P.'s IEP. [97] ¶ 32. The parents filed a motion for reconsideration, which the hearing officer denied. [97] ¶ 33.[7]

An IEP meeting was held at the end of August. [97] ¶ 35; [101] ¶ 70. Between June and August, the district did not conduct any further evaluations of H.P. [101] ¶ 69. The district also did not provide an alternative residential placement suggestion. [101] ¶ 69. There were no representatives from either Camphill or Vista Life at the August IEP meeting. [101] ¶ 70. There were no clinicians who had evaluated H.P. at the meeting. [101] ¶ 70. None of the IEP team members from the district had evaluated, observed, or met H.P. [101] ¶ 70. In drafting the IEP goals, the district did not request information from Camphill about H.P.'s current level of functioning. [101] ¶ 73. Instead, the current levels were once again largely copied from the March IEP. [97] ¶ 35(iv). The district claims it offered social work services to address H.P.'s emotional issues, but the parents declined the services. [97] ¶ 35(ii). The parents disagree, citing a letter from their attorney after the meeting pointing out the inaccuracies in the IEP documentation, including that the "Additional Notes/Information" section of the IEP recorded the opposite of what she had said in

---

[7] The parents initiated this federal-court litigation in September 2023. The initial pleadings sought to enforce H.P.'s placement at Vista Life as a statutory stay-put injunction. [97] ¶ 38; [1]; [6].

the meeting, and that the parents had suggested that H.P.'s language skills could be supported through social work services. [97] ¶ 35(ii). The IEP team formally changed H.P.'s placement to the district's CITE transition program. [101] ¶ 72.

The CITE program is the district's transition day-school program for eighteen to twenty-two-year-olds. [101] ¶ 61. It had 11 students in the classroom at the time of the due process hearing. [101] ¶ 64. It operated from 8:15 a.m. to 2:30 p.m. on Monday through Friday and was closed on weekends, holidays when the district was closed, and parent-teacher conference days. [101] ¶ 63. It did not provide direct services outside of school hours. [101] ¶ 63. It did provide some programming outside of school hours and conducted home visits if needed. [55-6] at 58; [55-10] at 375 (126:11–127:9), 381 (152:13–15). Some CITE students had a disability under the category of emotional disturbance, and some students had significant behavioral issues and physical aggression. [101] ¶ 64. Because the students' schedules were so individualized, there was a "fair amount of coming and going" of students in the classroom. [101] ¶ 64. While the program used a rewards-based structure, behavior management could be individualized based on the family's wishes. [55-10] at 379 (142:4–22).

In the fall of 2023, the district proposed The King's Daughters' School, an ISBE-approved residential facility. [97] ¶ 37; [101] ¶ 74. The school did not have teachers who were special-education certified. [101] ¶ 74.

Around this time, the parents hired another provider, Dr. Kathy Borchardt, to conduct another private neuropsychological evaluation of H.P. [97] ¶ 36; [101] ¶ 75.

14

Among other things, Borchardt agreed with Kornacker's assessments, interpretations, and recommendations. [101] ¶ 77. Borchardt recommended H.P.'s placement in a small residential setting, as well as a 1:1 aide. [97] ¶ 36; [101] ¶ 77.

In November, H.P. was suspended from Vista Life for physically assaulting a Vista Life staff member. [97] ¶ 41.[8] H.P. was allowed to return on the condition that if he continued to be physically violent toward staff, he would not be able to remain at Vista Life. [97] ¶ 41.

The due process hearing was held in December 2023. [97] ¶ 42. The hearing officer concluded (1) that the district denied H.P. a free and appropriate public education and (2) that the parents' unilateral placement of H.P. at Vista Life was appropriate. [97] ¶ 53; [55-1] at 29–31. He found that the district's decision to change H.P.'s placement from residential to day-school was unsupported by adequate evidence in the record. [55-1] at 29. He also found that Vista Life was an appropriate placement option for H.P. [55-1] at 31.

The hearing officer ordered the district to reimburse the plaintiffs for all costs related to H.P.'s placement at Vista Life, including tuition, room and board, and transportation, through August 22, 2024—H.P.'s twenty-third birthday. [55-1] at 32. He also ordered the district to reimburse the parents for the fees for Proficio Consulting group in finding H.P. a new placement, for the mileage expenses incurred during H.P.'s enrollment at his previous residential placement, and for the private neuropsychological evaluation completed by Borchardt before the due process

---

[8] The parties disagree over the length of the suspension, which I find to be immaterial.

hearing. [55-1] at 32–33. Finally, he ordered the district to complete a new evaluation and hold a new IEP meeting. [55-1] at 32.

Vista Life dismissed H.P. from their program in February 2024 after he physically assaulted a Vista Life staff member and his 1:1 aide. [97] ¶¶ 54–56. His parents enrolled him—once again unilaterally—at the Stables Autism Program in Tennessee the next month. [79] at 39.

## III. Analysis

### A. Free Appropriate Public Education

*1. The hearing officer erred in finding that the district denied H.P. a free appropriate public education when it changed his placement from residential to day school.*

The Individuals with Disabilities Education Act requires states that accept federal funding to "provide [disabled] children with an education that is free, public, and appropriate." *M.B.*, 668 F.3d at 860. A free appropriate education is one "specially designed to meet the unique needs of the" student, "supported by such services as are necessary to permit the child 'to benefit' from the instruction." *Bd. of Educ. of Murphysboro Cmty. Unit Sch. Dist. No. 186 v. Ill. State Bd. of Educ.*, 41 F.3d 1162, 1168 (7th Cir. 1994) (quoting *Bd. of Educ. v. Rowley*, 458 U.S. 176, 188–89 (1982)). "While the IDEA does not define the particular substantive level of education that must be provided to a child, the state must provide an education that is 'reasonably calculated to enable the child to receive educational benefits.'" *K.D. ex rel C.L. v. Dep't of Educ., Haw.*, 665 F.3d 1110, 1114 (9th Cir. 2011) (quoting *Rowley*, 458 U.S. at 206–07). The education must be delivered in the "least restrictive environment"

*appropriate* for the student. *Ross*, 486 F.3d at 273, 277; *Beth B. v. Van Clay*, 282 F.3d 493, 498 (7th Cir. 2002).

Education under the IDEA is guaranteed for students up until their twenty-second birthday. 20 U.S.C. § 1412 (a)(1)(A); *Kass v. W. Dubuque Cmty. Sch. Dist.*, 101 F.4th 562, 567 (8th Cir. 2024) ("Brody is now twenty-two years old and past the qualifying age for a FAPE under the IDEA."). Under Illinois law, a student who requires continued public-school education is eligible for services either until their twenty-second birthday, or, if their twenty-second birthday occurs during the school year, then through the end of the school year. 105 ILCS 5/14-1.02.

A state must "determine what is uniquely 'appropriate' for each child's education by preparing an [individualized education program] developed through the joint participation of the local education agency, the teacher, and the parents." *Hjortness ex rel. Hjortness v. Neenah Joint Sch. Dist.*, 507 F.3d 1060, 1064 (7th Cir. 2007); *Ostby v. Manhattan Sch. Dist. No. 114*, 851 F.3d 677, 680 (7th Cir. 2017). The IEP is a "written statement that is developed, reviewed and periodically revised in accordance with the Act," and documents the student's "present levels of academic achievement and functional performance; provides a list of measurable annual goals; describes how the child's progress towards the goals will be measured; and presents a statement of the special education and related services to be provided to the child, among other things." *Ostby*, 851 F.3d at 680 (citing 20 U.S.C. § 1414(d)(1)(A)). "A child's placement must be based on the IEP." *Hjortness*, 507 F.3d at 1064. "Whether

a school district has offered a free appropriate public education to a disabled student is a mixed question of law and fact." *Id.*

If the parents of a child disagree with an IEP team's decision relating to the educational placement in an IEP, they may file a due process complaint. 20 U.S.C. § 1415(b)(6); 34 C.F.R. § 300.507; 105 ILCS 5/14-8.02a(f); 23 Ill. Admin. Code §§ 226.570, 226.615. The hearing on the due process complaint may only address issues raised in the complaint, unless the complaint is properly amended or the opposing party agrees otherwise. 20 U.S.C. § 1415(f)(3)(B); 105 ILCS 5/14-8.02a(g). This rule should not be "mechanically applied," and "does not require that alleged deficiencies be detailed in any formulaic manner." *C.F. ex rel. R.F. v. New York City Dep't of Educ.*, 746 F.3d 68, 78 (2d Cir. 2014). For example, where an issue was addressed on the merits by the hearing officer *and* the issue was directly related to the issue identified in the complaint, the issue may not be foreclosed from review. *Id.*

The due process complaint filed by the parents in June 2023 claimed the district denied H.P. a free appropriate public education when it changed his educational placement to the CITE program without evidence that H.P.'s needs had changed. [55-1] at 48. This was also the issue certified at the pre-hearing conference. [55-1] at 5; [55-2] at 95–96.

After the hearing, the hearing officer found that the district denied H.P. a FAPE for essentially three reasons: (1) the district made procedural errors, [55-1] at 25–27; (2) the district failed to provide any current data in either the June or August IEP, [55-1] at 27–28; and (3) the IEP team developed a substantially deficient IEP in

both June and August by failing to reflect changes in H.P.'s needs or disabilities, failing to include goals to address those needs, failing to include measurable goals, and failing to reflect any discussion of H.P.'s "long-standing need for a one-to-one paraprofessional." [55-1] at 29.

The hearing officer found the district committed three procedural violations that denied H.P. a free appropriate public education. First, he found that the district incorrectly interpreted the new Illinois legislation, forcing H.P. to leave Camphill before his eligibility for services ended. [55-1] at 25–26. Second, he found that the district failed to provide written notice that the June 2023 IEP meeting would discuss a revision of the IEP. [55-1] at 26. Finally, the hearing officer found the district failed to include any provider who knew the student at the August IEP meeting. [55-1] at 26. The hearing officer found that separately and together, these errors impeded the parents' opportunity to participate in the decision-making process and caused a deprivation of educational benefits to H.P. [55-1] at 26–27.

The hearing officer also found that the proposed IEP was substantively deficient. He found that the district failed to provide "any current data" on H.P.'s present levels for either the June or August IEPs and failed to include input from people who knew H.P. and his unique needs. [55-1] at 27–29. The hearing officer faulted the district for failing to conduct new assessments of H.P. [55-1] at 27. Finally, the hearing officer found the proposed IEP failed to discuss H.P.'s need for a 1:1 aide. [55-1] at 29.

These procedural violations were not issues raised in the hearing request. 20 U.S.C. § 1415(f)(3)(B). The additional questions—whether the district failed to evaluate H.P., whether the goals in the proposed IEP were appropriate and measurable, whether H.P. required additional emotional supports or a 1:1 aide, the appropriateness of the supports, whether the district failed to provide notice of a change in placement, whether the district's attorney participated too much in the meeting, or whether the parent was prevented from participating in the IEP meeting—were not certified before the hearing. These questions, which are questions about the adequacy of the proposed IEP, were not issues raised in the complaint nor are they closely connected to the question of whether the change in placement was appropriate. *See C.F.*, 746 F.3d at 78.

The parents did not argue that the services in the proposed IEP were deficient.[9] Rather, they argued that taking H.P.'s needs and required services as outlined in the proposed IEP, he still required residential placement, and that CITE could not meet his needs in the IEP. The hearing officer erred in considering the procedural and

---

[9] The parents still do not argue that questions about the adequacy of the IEP were issues raised in the due process complaint. Instead, they argue first that reviewing the district's proffered IEP "reasonably informed" the hearing officer's conclusion that CITE could not meet H.P.'s needs. [79] at 29. They also argue that the hearing officer had a "substantial foundation on which to rest his conclusions concerning the adequacy of the IEP." [79] at 29. While the IEP is part of the record, the question of whether it is substantively adequate is different from whether a placement fulfills its requirements, and may require different factual findings, witnesses, and arguments. Though the parents argue that there was "considerable testimony" about the IEP goals and services, the district still would not be on notice that this was an issue they were required to address. This is not the case where the question of the adequacy of the IEP was "directly relate[d]" to the question at issue. *C.F.*, 746 F.3d at 78. They are two distinct questions, with some overlapping evidence, and not enough to affirm the hearing officer's decisions on those alternative grounds.

substantive issues that were not directly related to whether a change in placement level met the goals of the proposed IEP.

Turning to the issue agreed upon by all parties, the hearing officer decided that a change in placement level without a change in the student's needs violated the IDEA. The hearing officer's factual predicate—that there was insufficient (or no) evidence that H.P.'s needs had changed from his March 2023 IEP was not clearly erroneous. [55-1] at 13–14. The district largely conceded that by effectively cutting and pasting the pertinent parts of the March 2023 IEP into the proposed revised IEP. *Compare* [55-4] at 160–69, 185–92 *with* [55-5] at 79–83, 87–94. But the Act guarantees a free appropriate public education, and requiring a change in a student's needs before changing other parts of an IEP does not necessarily follow from the principle of a free appropriate public education. An IEP stands on its own and is measured against the Act, not necessarily against predecessor IEPs. No doubt a student's history and past IEPs are relevant and should be weighed when considering a challenge to a new IEP, but any IEP satisfies the Act if it meets the unique needs of the student in the least restrictive appropriate environment. The hearing officer presumed that the absence of changed needs meant that changed placement violated the law; that was an incomplete analysis and erroneous.

The parents cite one case to support the argument that changing a placement without evidence of a change in the student's needs is, by itself, a violation of IDEA. *In re Student with a Disability*, 123 LRP 14095 (SEA Del. Mar. 17, 2023), [79-1] at 101–10. The hearing officer there found that "the decision to change the placement to

a more restrictive environment…was made without new data being considered. Therefore, I find this to be in violation of the IDEA and corresponding state and federal regulations regarding the denial of FAPE." [79-1] at 107. The hearing officer cited no cases or the portions of the IDEA and its accompanying state and federal regulations to support this conclusion. This opinion is not persuasive.

The parents also cite *A.M. v. New York City Dep't of Educ.*, 845 F.3d 523, 544–45 (2d Cir. 2017), to support the argument that the district failed to put forth new evaluative materials that contradicted the evidence in support of H.P.'s continued residential placement. In *A.M.*, the court evaluated two substantive challenges of the parent: (1) the specific classroom setting offered in the IEP deprived her daughter of a FAPE and (2) the failure to guarantee 1:1 therapy was against the consensus of the evaluative materials at the IEP meeting and therefore deprived her daughter of a FAPE. *Id.* at 541. The court found that "when the reports and evaluative materials present at the [IEP] meeting yield a clear consensus, an IEP formulated for the child that fails to provide services consistent with that consensus is not reasonably calculated to enable the child to receive educational benefits, and the state's determination to the contrary is thus entitled to no deference because it is unsupported by a preponderance of the evidence." *Id.* at 543 (internal quotations omitted). Because the overwhelming evidence, including evaluative materials and witnesses who were familiar to the child, recommended 1:1 therapy, and because the IEP team did not put forward any evaluative materials or conduct its own evaluations

to contradict that evidence, the student in *A.M.* was denied a FAPE because of the IEP's failure to include 1:1 therapy. *Id.* at 545.

If there were clear consensus that only residential placement met H.P.'s needs, *A.M.* supports plaintiffs' argument here. But *A.M.* also supports the conclusion that if the chosen placement *succeeds* in providing services consistent with the clear consensus of the materials at the IEP meeting, the district does not per se violate the IDEA by not putting forth new evidence, even when changing a placement. After concluding that there was no new evidence, the question for the hearing officer remained whether the proposed IEP was nevertheless supported by the materials and evaluations submitted at the IEP meeting. For example, here, the district argues that even with the existing data, there was sufficient evidence that CITE was an appropriate placement for H.P. If CITE can provide H.P. the necessary services in his IEP, it is a placement "reasonably calculated to enable [him] to receive educational benefits." *K.D.*, 665 F.3d at 1114; *A.M.*, 845 F.3d at 543. The district's decision to change H.P.'s placement without evidence his needs had changed would not deny him a free appropriate public education in that case.

The necessary question for the hearing officer to answer, therefore, was whether CITE was "reasonably calculated to enable [H.P.] to receive educational benefits." *K.D.*, 665 F.3d at 1114; *A.M.*, 845 F.3d at 543. Though the hearing officer discussed the CITE program and why, compared to Vista Life, it was inadequate, he did so using facts that were clearly erroneous, as explained more below. He also did not, as the district points out, consider CITE on its own and whether it could offer

23

H.P. a free appropriate public education in the least restrictive environment. That was a failure to apply the correct legal test. The decision is reversed. A remand to the hearing officer for reconsideration with corrected factual findings may be the proper disposition. *See JH ex rel. JD v. Henrico Cnty. Sch. Bd.*, 326 F.3d 560, 568–69 (4th Cir. 2003) (where there were no findings by the hearing officer to allow meaningful appellate review, vacated judgment and remanded to district court to further remand to the hearing officer for reconsideration under the correct standard). But a remand, now that H.P. is past the age for services and the only question is retrospective relief, may be inefficient. Additional proceedings in the district court may be the best way to resolve the parties' disputes.

### 2. *Erroneous factual conclusions*

Factual errors further undermine the hearing officer's analysis. First, the district points out that the hearing officer erred in finding that Kornacker's evaluation recommended residential placement. [55-1] at 28–29. The hearing officer cited to Fact 42, a fact describing a letter from Camphill, to support the finding. [55-1] at 12. The parties agree that Kornacker's evaluation did not recommend any placement level. The hearing officer's finding is clearly erroneous.

Second, the hearing officer erred in finding that the district made decisions about H.P.'s IEP in sixth grade. The hearing officer seemed to believe the district here was part of the original decision to place H.P. at a therapeutic day school. This is not true; H.P. matriculated to the district in 2015, a few years after his initial placement at the therapeutic day school. *See* [101] ¶ 7.

24

Third, the hearing officer erred in attributing to the IEP team a finding that H.P. did not respond well to Applied Behavior Analysis therapy at his therapeutic day school. There is no evidence that the IEP team found this. H.P.'s father testified that the *family* did not like the reward-based behavior management system at the therapeutic day school. [55-10] at 110 (56:10–22), 112 (61:14–62:6). The district's Special Education Program Chair Lauren Achurra also testified that the therapeutic day school had a "behavior focus" that the *parents* were trying to avoid in H.P.'s next placement. [110] ¶ 1. Yet H.P.'s 2018 IEP still called for "daily rewards," "individual point systems," and "weekly rewards" in the "positive supports" section. [55-7] at 107. So did his 2021 and 2022 annual IEPs. [55-4] at 9–10, 43. The hearing officer's contrary statement is clearly erroneous.

Fourth, the hearing officer found that the IEP failed to "reflect any services or accommodations to address the Student's emotionality issues that certainly present as serious." [55-1] at 13. But the August IEP identified "supports" for positive behavioral interventions, including "access to alternative environments to process with reduce stimuli, access to students with similar social/emotional ability, alternative to work settings, calming areas in the classroom, facility in residential area with access to natural community outing locations, furniture used to physically structure classroom and work area, opportunities for breaks, outdoor space, reduced number of students in the building/classroom, reduced stimuli on walls, schedule for class, schedule for student, sensory areas within classroom, small class size, visuals, and speech-language services." [55-4] at 192. These supports are explicitly about

25

H.P.'s emotional and behavioral needs. The hearing officer's factual finding was clearly erroneous.

Fifth, the hearing officer incorrectly found that the IEP did not address H.P.'s deficits in understanding personal space, his need for repetitive instruction, or understanding social boundaries. The August IEP has, within the "Autism Considerations" section, subsections that consider H.P.'s "verbal and nonverbal communication needs," "social interaction skills and proficiencies," "needs resulting from resistance to environmental change or change in daily routines, and "needs resulting from engagement in repetitive activities and stereotyped movements." [55-4] at 191–92. The IEP's present levels of performance also discuss H.P.'s social tendencies and the fact that he "needs staff prompting and coaching to establish and maintain appropriate social boundaries." [55-4] at 179. The IEP also sets forth "aids, accommodations, and modifications" to address some of these issues. [55-4] at 185–6.

Sixth, the hearing officer erroneously found that H.P. had a long-standing need for a 1:1 aide that the district did not discuss or provide for. H.P. did not have a "longstanding" need for an aide. The Camphill Program Administrator testified that H.P. did not need an aide there because of the low staff-to-student ratio. [55-10] at 225 (21:22–22:3). The hearing officer, in his application section, found that H.P. "benefitted from a one-to-one paraprofessional support" at Camphill. [55-1] at 29. This was not true.

The district takes issue with other findings, but they do not amount to clear error. The district argues the hearing officer mischaracterized the goals of H.P.'s

August IEP because the goals were carried over at the parents' request, and the plan was to further customize the goals when the district collected baseline data once H.P. was in the CITE program. It is true that the parents requested the district to carry over goals from when H.P. attended Camphill. [97] ¶ 35(iv). This does not relieve the district of its duty to review "[c]urrent classroom-based, local, or State assessments, and classroom-based observations," and "[o]bservations by teachers and related services providers." 34 C.F.R. § 300.305(a)(ii) and (iii). The factual finding was not erroneous. The district argues that the hearing officer incorrectly found that CITE used a rewards-based behavior management system, but there was support for that finding. Megan Kennedy, a CITE program instructor, testified that she used a reward-based incentivizing structure using "natural rewards." [55-10] at 379 (142:4– 9). Although there is additional context—that behavior management could be individualized based on the family's wishes ([55-10] at 379 (142:4–22))—it was not clearly erroneous to find that CITE had a rewards-based behavior management system. The district also argues that the hearing officer erred in finding that the district failed to conduct evaluations or assessments. But the district admits that it did not conduct any assessments or evaluations on its own. Although it has an explanation, [55-5] at 97, and a district does not violate its obligation to reevaluate a child if the parent refuses consent to the reevaluation, 34 C.F.R. § 300.300(c)(iii), the fact that it did not evaluate H.P. was correct.

In sum, there were factual errors in the hearing officer's decision. Those errors create an additional gap between the finding that H.P.'s needs had not changed and

the conclusion that a change in his placement level would deprive him of a free appropriate public education.

## B. Stay-Put

After the parents moved H.P. to Vista Life, they filed a motion at the administrative level to enforce statutory stay-put placement, arguing that Vista Life was H.P.'s stay-put placement. [97] ¶ 31. The hearing officer denied the parents' motion and ordered the district to find a residential facility to implement H.P.'s IEP. [97] ¶ 32. The parents filed a motion for reconsideration, which the hearing officer denied. [97] ¶ 33. The district put forth the King's Daughters' School as an ISBE-approved residential stay-put placement option, which the parents rejected. [97] ¶ 37; [101] ¶ 74. The parents filed this suit to enforce H.P.'s right to a stay-put placement at Vista Life in September 2023. [97] ¶ 38; [1]; [6].

In May 2024, I granted plaintiffs' motion to enforce stay-put placement in part. [64] at 1. I found that "[r]esidential placement was required by the last agreed-upon IEP and even if the school district genuinely believed that residential placement was no longer necessary, it had to comply with the residential placement provision until it arrived at a new agreed-upon IEP." [64] at 3. However, I stayed the relief ordered by the hearing officer until the resolution of this appeal. [64] at 4. The parents filed for reconsideration. [71].

### 1. Merits

When a parent requests a due process hearing, unless the district and parents agree, the student "shall remain in the then-current educational placement of the

child." 20 U.S.C. § 1415(j); 105 ILCS 5/14-8.02a(j) ("During the pendency of any administrative or judicial proceeding conducted pursuant to this Section…the student shall remain in his or her present educational placement and continue in his or her present eligibility status and special education and related services, if any."). This provision operates as an "automatic preliminary injunction." *K.D.*, 665 F.3d at 1117.[10] This stay-put provision "maintains the status quo of the child's placement *until the complaint has been fully resolved*." *Ostby*, 851 F.3d at 681 (emphasis added). This requires the school district to continue to pay for the "then-current educational placement" until the complaint is fully resolved. *Rena C. v. Colonial Sch. Dist.*, 890 F.3d 404, 415 (3d Cir. 2018). "If the hearing officer in a due process hearing…agrees with the child's parents that a change of placement is appropriate, that placement must be treated as an agreement between the State and the parents for purposes of" stay-put. 34 C.F.R. § 300.518(d).

"[E]ntitlement to stay-put relief is not predicated on the provision of a FAPE." *Davis v. Dist. of Columbia*, 80 F.4th 321, 327 (D.C. Cir. 2023); *Olu-Cole v. E.L. Haynes Pub. Charter Sch.*, 930 F.3d 519, 524 (D.C. Cir. 2019) (quoting *Mackey v. Bd. of Educ. for Arlington Cent. Sch. Dist.*, 386 F.3d 158, 161 (2d Cir. 2004)) ("To put it more simply, 'all handicapped children, regardless of whether their case is meritorious or not, are to remain in their current educational placement until the dispute with regard to their placement is ultimately resolved.'"). So even though I conclude that

---

[10] To the extent the district argues that the parents were required to seek a stay-put injunction, it is incorrect. Stay-put is automatic upon the filing of a due process request. *K.D.*, 665 F.3d at 1117.

the hearing officer erred, that does not absolve the district of its conduct while the challenge to the new IEP played out.

Where the parents have challenged a proposed placement that is pending when stay-put relief is sought, the "then-current educational placement" is typically "the child's last agreed-upon educational program before the parent requested a due process hearing to challenge the child's" placement. *Ventura de Paulino v. New York City Dep't of Educ.*, 959 F.3d 519, 532 (2d Cir. 2020). The last agreed-upon IEP here was the March 2023 IEP, which called for residential placement. [94] at 6–7; [96] at 13; [103] at 13.

Educational placement is "something more than the actual school attended by the child and something less than the child's ultimate educational goals." *Bd. of Educ. of Cmty. High Sch. Dist. No. 218 v. Ill. State Bd. of Educ.*, 103 F.3d 545, 549 (7th Cir. 1996). A stay-put placement in a comparable program "must produce as closely as possible the overall educational experience enjoyed by the child under his previous IEP." *John M. v. Bd. of Educ. of Evanston Twp. High Sch. Dist. 202*, 502 F.3d 708, 715 (7th Cir. 2007). The overall educational experience H.P. was receiving under the March 2023 IEP was 24/7 residential care. The district had no authority to "unilaterally modify" his educational program during the pendency of the IEP dispute. *Ventura de Paulino*, 959 F.3d at 534. It was instead required to find a suitable residential facility pending the outcome of the case. *Cmty. High Sch. Dist. No. 218*, 103 F.3d at 549 (district was "obliged to effect the stay-put provisions and preserve an 'educational placement'"); *Ostby*, 851 F.3d at 681.

30

The district argues that because Camphill started after H.P.'s twenty-second birthday, he was not eligible for services there under the Illinois School Code. On the other hand, because the district's CITE program began before H.P.'s birthday, the district said it would extend H.P.'s services for a year in the CITE program. The district's own argument implies that if there had been a residential serving school with a start date before H.P.'s twenty-second birthday, he was entitled to services there. Once the parents filed the due process notice, H.P. was guaranteed a stay-put placement, which was, under the last agreed-upon IEP, a residential placement. The district, which had already agreed to extend services, now had to find a residential placement for H.P. that fit its criteria that the school year start before H.P.'s birthday.

It is up to the district, not the parent, to decide how to ensure the provision of the last-agreed upon educational program. *Ventura de Paulino*, 959 F.3d at 534. If the serving school is no longer available and the district refuses or fails to find a new placement, the parents may move the student to a placement that would meet the demands of the last agreed-upon IEP. *Cmty. High Sch. Dist. 218*, 103 F.3d at 549–50 (where the school district forfeits its right to redirect a student's placement, the courts and parents have the power to effect the student's placement).[11] The parents found Vista Life, a residential facility. Because the district "fail[ed] to produce any placement alternatives" until after H.P.'s twenty-second birthday, I have "no other

_____

[11] The district argues that it was its own "right and burden" to find a placement. [11] at 5. However, until late August, it failed to find a residential placement, which was the placement necessary under the stay-put injunction, until ordered to do so by the hearing officer. [97] ¶ 32. Like in *Cmty. High Sch. Dist. No. 218*, the court and the parents have the power to effect placement where the district has forfeited that right by failing to put forward an alternative placement.

schools to evaluate or weigh against" Vista Life. *Cmty. High Sch. Dist. No. 218*, 103 F.3d at 550.

Vista Life was a placement comparable to Camphill. Vista Life had a transition program certified by the Connecticut State Board of Education for the provision of special education services. [101] ¶ 37. It was also certified by the National Commission for the Accreditation of Special Education Services. [101] ¶ 37. Its students practiced life skills in a naturally occurring environment, like Camphill. [101] ¶¶ 20, 38. Vista Life's staff received training and professional development for working with students with autism, responding to medical needs like seizures, and de-escalating. [101] ¶ 38. It used a behavior system similar to Camphill's. [101] ¶¶ 19, 39. Students at Vista Life received about fifty-five hours a week of programming; H.P.'s March 2023 IEP called for forty hours a week in residential school courses. [101] ¶ 40; [55-5] at 99. For purposes of stay-put, Vista Life could offer services comparable to Camphill to H.P. *See John M.*, 502 F.3d at 715.

The district argues that H.P. withdrew from the district to attend a post-secondary program. H.P. did not withdraw from the district; he was forced to leave his current placement because of the district's actions. The district cannot fault the parents' choice when it initially failed to put forth any option for H.P. at a residential facility pursuant to the stay-put injunction. *Cf. Murphysboro Cmty. Unit Sch. Dist. No. 186*, 41 F.3d at 1168 (if a school district fails to provide a child with an adequate plan, the court is unable to determine whether the parents' private placement is the least restrictive alternative because it is "the *only* alternative." (emphasis in

32

original)). The district cannot complain because "this situation resulted directly from the school district's failure to present a viable alternative." *Murphysboro Cmty. Unit Sch. Dist. No. 186*, 41 F.3d at 1168. The district failed to put forth a stay-put placement that complied with the demands of the last agreed-upon IEP until late August. This violated the IDEA and the Illinois School Code.

The district was required under the IDEA and the Illinois School Code to fund H.P.'s stay-put placement while the plaintiffs challenged the change to H.P.'s IEP. *Casey K. v. St. Anne Cmty. High Sch. Dist. No. 302*, 400 F.3d 508, 510 (7th Cir. 2005). The question of stay-put is a separate one from the merits of whether the district denied H.P. a free appropriate public education and whether the parents should be reimbursed for their unilateral placement at Vista Life. *See Ostby*, 851 F.3d at 685; *Tina M. v. St. Tammany Parish Sch. Bd.*, 816 F.3d 57, 60 (5th Cir. 2016) ("Contrary to the district court's conclusion, the ALJ's stay-put order was not a ruling on the merits.").

I stayed the hearing officer's order that the district reimburse plaintiffs for the costs of Vista Life, because I concluded reimbursement would irreparably harm the district in the event that retrospective relief were reversed. [64] at 4. Although I acknowledged that § 1415(j) placed the costs onto the district, I thought it nevertheless an irreparable harm to require the district to reimburse under the unusual fact pattern presented here with the passage of time. [64] at 4. But in hindsight, a few things are different. I am now persuaded that the district has no basis to avoid its responsibility under § 1415(j) to fund H.P.'s placement at Vista Life

33

at least through its selection of King's Daughters' School; Vista Life was not a unilateral placement, it was the statutory stay-put placement, until then. And even though contrary to my initial view (*see* [64] at 4) I now find that the hearing officer's decision at the due process hearing was compromised by legal and factual error, that has no bearing on the consequences for the district's initial failure to comply with the statutory stay-put requirement. The parents' motion for reconsideration of the stay is granted—they are entitled to some immediate compensation to vindicate the stay-put injunction that the district bungled. I am not certain, however, of the scope of that compensation.

### 2. Relief

Because IDEA funds cover educational costs for students up until their twenty-second birthday, H.P. is entitled to compensation for his stay-put placement costs up until his twenty-second birthday. Stay-put protections based on the federal act ended on H.P.'s birthday on August 22, 2023, and the IDEA no longer funded H.P.'s education. The federal protections in the IDEA could only be applied to him through their incorporation into the Illinois School Code and its related regulations. *Bd. of Educ. of Oak Park & River Forest High Sch. Dist. 200 v. Illinois State Bd. of Educ.*, 79 F.3d 654, 659 (7th Cir. 1996) ("Except for the judge-created remedial exception for claims for compensatory education, the entitlements created by the Individuals with Disabilities Education Act expire when the disabled individual turns 21."); *Honig v. Doe*, 484 U.S. 305, 318 (1988) (because respondent was twenty-four years old, he was "no longer entitled to the protections and benefits of the [IDEA]," and "whatever

34

rights to state educational services he may yet have…the Act would not govern the State's provision of those services"). IDEA funds are only available for special education and related services for students "aged 6 through 21." 20 U.S.C. § 1411(a)(2)(B)(i)(II); *see also* 34 C.F.R. § 300.101; Ill. State Bd. of Educ., Frequently Asked Questions: Public Act 102-0172 and Public Act 102-0174, at 5 (rev. 2021).[12] However, beginning in 2021, the Illinois School Code extended protections, including a free appropriate public education, through the school year for students who turn twenty-two after the start of the school year. 105 ILCS 5/14-1.02, P.A. 102-172, § 5 (2021). Those services and protections are under the Illinois School Code and the funds to pay for those services and protections must come from the state and district. The Illinois School Code has its own stay-put provision: 105 ILCS 5/14-8.02a(j) ("During the pendency of any administrative or judicial proceeding conducted pursuant to this Section…the student shall remain in his or her present educational placement and continue in his or her present eligibility status and special education and related services, if any.").

I had previously noted that the Illinois law's expansion of eligibility is likely incorporated into the IDEA and therefore, the school district was not likely to prevail on its argument that H.P. was not entitled to the benefits of federal law after turning twenty-one. [64] at 3. However, upon reconsideration, I now conclude that the age-eligibility expansion was not substantive—it did not change the standards for a free

---

[12] Available at https://www.isbe.net/Documents/FAQ-HB-40-HB-2748.pdf.

appropriate education, only its duration. The age-eligibility expansion is therefore not incorporated into the IDEA.

The "core right" guaranteed by the IDEA is a "free appropriate public education," which means "special education and related services" provided for free to an eligible student (and his parents) and at the public expense and that "meet the standards of the State educational agency." *David D. v. Dartmouth Sch. Comm.*, 775 F.2d 411, 417 (1st Cir. 1985). The IDEA incorporates the state standards; not doing so "would conflict with the cooperative federalism courts have found to be the structural principle undergirding the Act." *Id.* at 418–19. Federal courts can determine whether states have met their own standards and in turn, provided a FAPE to a student. *Id.* at 420. Massachusetts, for example, required that special education facilities be "equal in physical aspects," that there be no signs designating classrooms as special education classrooms, and that transportation be provided to special education-eligible students. *Id.* at 418. Federal courts are empowered to determine whether a school district has implemented these state standards for providing a FAPE to special-education eligible students.

The extension of services to students through the end of the school year in which they turn twenty-two does not substantively expand the standards by which I determine whether H.P. was denied a free appropriate public education. A student's age determines whether they are eligible to receive a FAPE, not whether they received one under the standards set by the State. Under the federal IDEA, a student is eligible for a FAPE until their twenty-second birthday. Under the Illinois School

36

Code, a student is eligible for a FAPE until their twenty-second birthday, or until the end of the school year in which they turn twenty-two. Under either the IDEA or Illinois School Code, the services that are provided to meet the Illinois standards for a FAPE remain the same; the Illinois School Code simply extends the time for which those services are provided.

That said, the Illinois School Code independently guarantees H.P. a free appropriate public education and has its own stay-put provision. 105 ILCS 5/14-8.02a(j). Once the district put forth King's Daughters' School and the parents rejected it, however, Vista Life likely was no longer the stay-put placement. The stay-put provision does not eliminate a school district's "preexisting and independent authority to determine *how* to provide the most-recently-agreed-upon educational program." *Ventura de Paulino*, 959 F.3d at 534. It is the district's responsibility, not the parents', "to decide how to provide" the student's educational program until the IEP dispute is resolved. *Id.* If the parents seek to enroll the student in a different school than the district's choice, they take on the financial risk of that choice. *Id.* In seeking district reimbursement for Vista Life after King's Daughters' School was put forward as a stay-put placement, the parents effectively sought a "'veto' over school choice rather than 'input'—a power the IDEA clearly does not grant them." *Id.*; *Sch. Comm. of Town of Burlington v. Dep't of Educ. of Mass.*, 471 U.S. 359, 373–74 (1985) ("[P]arents who unilaterally change their child's placement during the pendency of review proceedings, without the consent of state or local school officials, do so at their

own financial risk."). If King's Daughters' School could implement H.P.'s IEP, the parents had no authority to reject it as a placement.

The parents argue that King's Daughters' School was inappropriate, in part because it did not have teachers who were special-education certified, and because the facility used the rewards-based behavioral interventions the parents did not like. But the King's Daughters' School was ISBE-approved, and the March IEP did not forbid the use of rewards-based interventions for H.P. [55-5] at 79, 93. The school also offered speech services, which all parties agree H.P. needed. *See* [97] ¶¶ 16, 25, 27, 35(ii). The parents' unilateral decision that King's Daughters' School was inappropriate does not entitle them to stay-put reimbursement for Vista Life if the King's Daughters' School could implement H.P.'s March 2023 IEP. Additional proceedings are necessary to determine whether the King's Daughters' School could do so, and if not, whether the parents should be reimbursed for their placement at Vista Life.

The discretion to fashion a remedy for IDEA violations is provided for by the IDEA and is for compensatory relief based on the violation of the Act. *Oak Park & River Forest High Sch. Dist. 200*, 79 F.3d at 659–60; 20 U.S.C. § 1412(a)(10)(C)(ii). Because H.P.'s IDEA protections ended on his twenty-second birthday, neither I nor the hearing officer had the authority to extend relief based on the IDEA to cover H.P.'s continued education once he turned twenty-two, including for any stay-put placement. But the Illinois School Code, like the IDEA, allows a court to "grant such

relief as the court determines is appropriate." 105 ILCS 5/14-8.02a(i).[13] It is not clear from the record when the district chose King's Daughters' School to implement H.P.'s IEP. If the district failed to put forth a stay-put placement despite its obligation to do so under state law (which covered H.P. after his twenty-second birthday), it may be appropriate to order equitable relief under 105 ILCS 5/14-8.02a(i).

Once the district *did* find what appears to be a suitable residential facility as a stay-put placement—King's Daughters' School—and the parents rejected that choice, they likely no longer were entitled to reimbursement. Further proceedings are necessary to resolve whether a violation of the stay-put injunction should be compensated by reimbursement for the costs for Vista Life after H.P.'s twenty-second birthday, or after the proposal of the King's Daughters' School as H.P.'s stay-put placement.[14]

---

[13] The district argues that the expansion of local services without funding violates the State Mandates Act, 30 ILCS 805/8(a). Where a bill mandates that services be expanded by a local government, the bill also must have an appropriation to fund the expansion through reimbursement unless there is a statement in the bill excluding reimbursement liability. 30 ILCS 805/6(f). "[T]he failure of the General Assembly to make necessary appropriations shall relieve the local government of the obligation to implement any service mandates…unless the exclusion provided for in this Section are explicitly stated in the Act establishing the mandate." 30 ILCS 805/8(a). The Illinois School Code does not provide for a companion appropriation bill to make up for the additional costs of funding H.P.'s education through the end of the school year in which he turned twenty-two. But it seems that at least some expenditures for H.P.'s schooling would be reimbursable. Frequently Asked Questions: Public Act 102-0172 and Public Act 102-0174, at 5–6 (rev. 2021). And in any event, the Illinois School Code gives broad discretion to "grant such relief as the court determines is appropriate." 105 ILCS 5/14-8.02a(i). If the district owes a compensatory education because of its violation of a stay-put injunction, where it finds the funds to pay is not necessarily relevant, although it may be a proper consideration for any court deciding what relief is appropriate.

[14] I had previously ordered the school district to pay for the costs for residential placement until August 22, 2024. [64] at 1. Under 105 ILCS 5/14-1.02, a student is eligible for services "through the end of the school year." The statute does not include extended school-year services. The Illinois State Board of Education has also defined "school year" as "the regular term that is specified in the regular school calendar as adopted by the serving entity." Ill.

### C.      Motion to Supplement the Record

The parents moved to supplement the record to include affidavits from N.P. and educational and therapeutic consultant Kate Rinaldi and a statement of billing from Stables Autism Program in support of their motion for summary judgment. [88], [89]. The affidavits contained a rebuttal to a statement in the Vista Life Exit Summary that I have already deemed immaterial. *See* n.8, above. The affidavits also discuss H.P.'s placement at Stables Autism Program.

To the extent the affidavits seek to rebut immaterial evidence, they are not necessary. Additionally, the Exit Summary may be relevant to the issue of whether any unilateral placement at Vista Life was appropriate, but that issue is not before me, as the hearing officer erred in failing to conduct a complete analysis of whether CITE could implement H.P.'s IEP. *See* Section III.A.1. The evidence is also not relevant for the question of whether, in the summer of 2023, Vista Life, as the only residential option presented to the hearing officer, was an appropriate stay-put placement.

As for the information regarding Stables, there is no administrative record below regarding the Stables Autism Program and whether it is an appropriate placement. The question of whether H.P.'s placement at Stables was appropriate is beyond the scope of the record before me. It is premature for me to address the

---

State Bd. of Educ., Frequently Asked Questions: Public Act 102-0172 and Public Act 102-0174, at 4 (rev. 2021). This does not include summer school or extended school year terms. *Id.* Reimbursement should be limited to costs up to the end of the school's regular term.

question of reimbursement for Stables, and evidence regarding it is not needed for this decision. The motion to supplement the record is denied.

## IV. Conclusion

The motions for summary judgment, [79] and [83], are granted in part, denied in part. The hearing officer's decision is reversed. The parents' motion for reconsideration of the order denying enforcement of stay-put, [71], is granted in part, but calculating the amount of reimbursement owed is subject to further proceedings. The motion to supplement the record, [87] and [88], is denied. A status hearing will be scheduled with the court to address additional proceedings in this court or before the hearing officer.

ENTER:

_____
Manish S. Shah
United States District Judge

Date: February 27, 2025