UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| H.P., by and through his Parents and Guardians, N.P. and S.P.,<br><br>Plaintiffs and Counter-Defendants,<br><br>v.<br><br>BOARD OF EDUCATION OF OAK PARK AND RIVER FOREST SCHOOL DISTRICT 200,<br><br>Defendant and Counter-Plaintiff. | No. 23 CV 7103<br><br>Judge Manish S. Shah |

**MEMORANDUM OPINION AND ORDER**

Plaintiffs H.P. and his parents, N.P. and S.P., challenged his school district's decision to change his placement from a residential facility to the district's therapeutic day school. They alleged a denial of a free appropriate public education under the Individuals with Disabilities Education Act. They filed a motion to enforce a stay-put injunction to keep H.P. in his residential placement. The district put forward another residential placement for H.P. to attend pending the outcome of the proceedings over the proposed change in H.P.'s individualized education program. The parents rejected that placement and kept H.P. at their chosen facility.

An independent hearing officer held an administrative hearing, after which he ruled in favor of the parents. The hearing officer concluded that the district denied H.P. a free appropriate public education and that the parents' placement was appropriate. I reversed the hearing officer's decision, based on factual and analytical

errors in the decision but found that the district had violated the stay-put injunction. I ordered additional briefing on whether the district denied H.P. a FAPE when changing his placement from a residential to day-school level, and on the appropriate remedy for the district's stay-put violation. The parties filed cross-motions for summary judgment on those issues. For the reasons discussed below, I grant in part and deny in part each motion.

## I. Legal Standards

Under the Individuals with Disabilities Education Act, "[c]ross-motions for summary judgment are the standard method for presenting a case to a district court for decision on the record compiled by the administrative tribunal that the court is reviewing." *Dale M. ex rel. Alice M. v. Bd. of Educ. of Bradley-Bourbonnais High Sch. Dist. No. 307*, 237 F.3d 813, 816 (7th Cir. 2001). A district court "shall" (1) receive the records of the administrative proceedings, (2) hear additional evidence at the request of a party, and (3) grant such relief as the court determines is appropriate, based on the preponderance of the evidence. 20 U.S.C. § 1415(i)(2)(c). Despite the word "shall," I have the discretion to admit additional evidence to supplement the record. *Bd. of Educ. of Tp. High Sch. Dist. No. 211 v. Ross*, 486 F.3d 267, 270 (7th Cir. 2007).[1] Where a district court "reviews only that evidence that was before the administrative tribunal," a summary judgment motion is "simply the procedural vehicle for asking the judge to decide the case on the basis of the administrative record." *M.B. ex rel.*

[1] For this reason, I consider N.P.'s additional affidavit submitted in support of plaintiffs' motion over the district's opposition. [149-1]; [161] at 12–13.

*Berns v. Hamilton Se. Schs.*, 668 F.3d 851, 860 (7th Cir. 2011) (quoting *Todd v. Duneland Sch. Corp.*, 299 F.3d 899, 904 (7th Cir. 2002)). I give "due weight" to the factual determinations of the administrative tribunal; this review is "equivalent to a 'clear-error' or 'substantial-evidence' standard." *Id.* (quoting *Sch. Dist. of Wis. Dells v. Z.S.*, 295 F.3d 671, 675 (7th Cir. 2002)). If I accept new evidence not considered at the administrative level, I defer less to the administrative decision—the standard of review is a "sliding scale." *Z.S.*, 295 F.3d at 675. The party challenging the outcome of the administrative proceedings bears the burden of proof. *M.B.*, 668 F.3d at 860.

## II. Background

H.P. was an enrolled student in the Oak Park and River Forest School District 200 in Oak Park, Illinois. *H.P. by and through N.P. v. Bd. of Educ. of Oak Park & River Forest Sch. Dist. 200*, No. 23 CV 7103, 2025 WL 641113, at *2 (N.D. Ill. Feb. 27, 2025); [154] ¶¶ 4, 7.[2] N.P. and S.P. are his parents. [154] ¶ 5. As a child, H.P. experienced seizures and was diagnosed with aphasia following epilepsy. [154] ¶ 9; [162] ¶ 1. This caused him to have losses and delays in his language development.

[2] Bracketed numbers refer to entries on the district court docket and page numbers refer to the CM/ECF header placed at the top of filings. In the case of citations to hearing transcripts, I also use the transcript's original page numbers. The facts are largely taken from the parties' responses to their adversary's Local Rule 56.1 statement of facts, [154], [162], [167] and [174] (where the assertion and response are set forth in one document). Many facts are the same as, or similar to, the facts in *H.P. by and through N.P. v. Bd. of Educ. of Oak Park & River Forest Sch. Dist. 200*, No. 23 CV 7103, 2025 WL 641113 (N.D. Ill. Feb. 27, 2025). Any asserted fact that is not controverted by reference to specific, admissible evidence is deemed admitted. N.D. Ill. Local R. 56.1(e)(3); *see Cracco v. Vitran Exp., Inc.*, 559 F.3d 625, 632 (7th Cir. 2009). I disregard legal arguments in the statement of facts. *See Cady v. Sheahan*, 467 F.3d 1057, 1060–61 (7th Cir. 2006). The parties dispute many facts, but the facts in those disputes are not all material. To the extent disputed facts are relevant and the parties rely on admissible evidence, I include both sides' versions.

[162] ¶ 39. He was also diagnosed with an intellectual disability and found to have features of autism spectrum disorder. [154] ¶ 9. The licensed clinical psychologist who diagnosed H.P. opined that a diagnosis of Landau-Kleffner Syndrome, a neurological condition associated with a loss of expressive and receptive language, should be considered. [154] ¶ 9; [162] ¶¶ 1, 39.

When he was in sixth grade, H.P. received an individualized education program that placed him at a therapeutic day-school level. [154] ¶ 10. In the fall of 2015, H.P. matriculated to Oak Park and River Forest School District 200. [154] ¶ 7. The district maintained his placement at the therapeutic day school until 2018, when H.P.'s parents became concerned about that placement. [154] ¶ 10; [55-7] at 103–04; [55-10] at 112–13 (63:9–68:10), 142 (183:3–6). The parents hired Dr. Colin Brietzke, a licensed clinical psychologist, to evaluate H.P. [162] ¶ 1; [167] ¶ 1. In his report, Brietzke opined that no amount of modification of H.P.'s then-current day-school placement could render it an appropriate setting for H.P.'s educational needs. [162] ¶ 1; [167] ¶ 1. The parents shared the report with the district. [162] ¶ 1; [167] ¶ 1. H.P.'s IEP team unanimously agreed to change H.P.'s placement to residential. [162] ¶ 2. He was enrolled at the Camphill School, a private residential special education school in Pennsylvania that is approved by the Illinois State Board of Education. [154] ¶ 12; [162] ¶ 5.

H.P. made progress while at Camphill. [154] ¶¶ 22, 28; [162] ¶ 7. The parents considered moving H.P. to a more suburban environment, like Oak Park, but in the spring of 2020 when the COVID-19 pandemic broke out, they opted to keep H.P. at

Camphill. [154] ¶ 13. H.P. shifted from Camphill's K–12 program to its transition program. [154] ¶ 12; [162] ¶ 5; [55-10] at 120–21 (94:1–97:9).

On July 28, 2021, the State of Illinois passed a statute that extended special education services for students. 105 ILCS 5/14-1.02; *see also* [154] ¶ 19; *H.P.*, 2025 WL 641113, at *3. Before, students would lose access to services on their twenty-second birthday. *H.P.*, 2025 WL 641113, at *3. Now, students are eligible until their twenty-second birthday, unless their twenty-second birthday "occurs during the school year, in which case he or she is eligible for such services through the end of the school year." 105 ILCS 5/14-1.02; *H.P.*, 2025 WL 641113, at *3. The district, based on the Illinois State Board of Education's guidance, interpreted the law to mean that a student's twenty-second birthday must fall after the start date of the *serving school*, not the district, for the student to be eligible for services through the end of the school year. [154] ¶ 19; *H.P.*, 2025 WL 641113, at *3. H.P.'s twenty-second birthday fell after the district's 2023–24 school year began, but before Camphill's school year began. [154] ¶ 19. Because H.P.'s birthday fell before Camphill's start date, the district told the parents and Camphill that H.P. would not be eligible for services under the new bill. [154] ¶ 19; [162] ¶ 9; *H.P.*, 2025 WL 641113, at *3. Camphill released H.P.'s seat for the 2023–24 school year. [162] ¶ 9.

The parents began searching for a new school for H.P., and believed a facility called Vista Life Innovations could be a good placement option. [154] ¶ 20; [162] ¶¶ 10–11. Vista Life was accredited by the National Commission for the Accreditation of Special Education Services. [162] ¶ 12. It operated a residential transition program

that was approved by the state of Connecticut as a transition program for special education services. [162] ¶ 12. The program allowed students to practice life skills in a naturally occurring environment. [162] ¶ 12. Vista Life was a 365-day-a-year facility with on-site overnight staff and after-hours support, where students participated in about fifty-five hours of weekly programming and additional recreational activities after hours. [162] ¶ 13.

In March 2023, H.P.'s IEP team met. [162] ¶ 6. It discussed H.P.'s upcoming departure from Camphill in July. [154] ¶ 23; [55-5] at 97. H.P.'s IEP team continued to recommend residential placement. [162] ¶¶ 4, 15; [167] ¶ 2. Changing H.P.'s placement level, including to the district's day-school transition program, Community Integration Transition Education, was not discussed. [154] ¶ 23; [55-5] at 97. The IEP set out H.P.'s then-present levels of academic, developmental, and functional performance based on reports from Camphill staff. [162] ¶ 7. At the meeting, Camphill staff reported that H.P. was able to participate in daily routine activities, was a strong reader, was skilled in adding and subtracting single digit numbers, had a strong understanding of safety signs and situations, and had acquired farming, hard, and soft skills. [154] ¶ 22.[3] The IEP reflected that at Camphill, H.P. often needed prompts and assistance from staff to complete assignments and activities. [162] ¶ 8; [55-5] at 79–83; [55-10] at 235 (63:13–16), 236 (65:10–66:4). Camphill staff

[3] The parents' response does not contradict the asserted fact and makes arguments based on inferences that can be drawn from this fact.

reported H.P. was almost independent with daily self-help skills such as serving himself food, eating, dressing himself, showering, and using the bathroom. [154] ¶ 22.

Camphill staff also observed certain limitations on H.P.'s abilities. H.P. had "inconsistent" receptive language skills, had a difficult time maintaining focus on a task, and was easily distracted by his surroundings. [162] at 8. H.P. needed guidance to perform tasks like setting the table, rinsing dishes, showering, and brushing teeth. [162] ¶ 8; [55-5] at 80. To varying degrees, H.P. needed reminders, prompts, modeling, or supervision to stay focused and complete tasks in nearly every area assessed. [162] ¶ 8; [55-5] at 79–81. H.P. also struggled with managing his emotions and expressing his feelings. [162] ¶ 8.

The March 2023 IEP noted that in his most recent cognitive assessment, H.P. scored a 51 on the full-scale IQ test, which was "within the .1 percentile, Severe range." [162] ¶ 7. H.P.'s processing speed and working memory were also in the "severe" ranges. [162] ¶ 7. The IEP said that H.P. had difficulty "holding information in short-term memory while performing some operation or manipulation with it then correctly producing the transformed information" and that H.P. "has the ability to learn new information but will require additional time to solidify concepts and will continue to have difficulty transposing learned tasks within new concepts." [162] ¶ 7; [55-5] at 84. The IEP called for 2400 minutes (or 40 hours) of residential-school courses per week. [55-5] at 99. The IEP concluded that H.P.'s continued placement in a private out-of-state residential facility would be the appropriate level of support

based on H.P.'s needs, and that a day-school placement would not be enough support. [162] ¶ 6.

At the due process hearing challenging the district's proposal to change H.P.'s placement, Camphill's director of special education Lauren Geiger-Martin, who worked with H.P. for about three years at Camphill, testified that H.P. had made progress at Camphill but required ongoing residential placement to maintain and advance that progress. [162] ¶ 68; [167] ¶ 7. She said that H.P. struggled with skill regression when he was away from his residential program, such as for holiday breaks. [162] ¶ 66. She also testified, contrary to another Camphill employee's report, that if H.P. were alone in his own apartment, he would not be able to do "self-help skills" without the level of support provided at Camphill. [55-10] at 237 (72:12– 22); [162] ¶ 68; [167] ¶ 7. She said that H.P. "need[ed] reminders across so many different skill domains and [was] somebody who [was] really deeply affected by transitions and changes and breaks to the schedule and routine." [162] ¶ 68; [167] ¶ 7.

In April 2023, the parents once again hired a doctor, Dr. Rachel Kornacker, to perform a neuropsychological evaluation of H.P. [154] ¶ 24; [162] ¶ 38. Kornacker's report maintained H.P.'s diagnosis of aphasia following epilepsy and concluded that H.P.'s moderate disability and language-based challenges were best understood as Landau-Kleffner Syndrome. [154] ¶ 29; [162] ¶ 39; [55-5] at 58. The report showed H.P. had a full-scale IQ score of 55, which is in the "impaired" range, his verbal comprehension, working memory, and processing speeds were in the "impaired" range, his perceptual reasoning skills were in the "borderline" range, and his adaptive

function was in the "low" range. [154] ¶ 28; [162] ¶ 38. The report noted that H.P. had made significant progress in his adaptive functioning skills, and his perseverance on tasks had improved, though he still struggled with language delays, needed consistent redirection, usually required prompting to engage in organization, and struggled to maintain attention when not motivated. [154] ¶ 28; [162] ¶ 38. In testing H.P.'s visuospatial memory, Kornacker found that H.P. was in the "impaired" range for total recall, delayed recall, and recognition discrimination index. [55-5] at 66. Kornacker's report noted that H.P. could navigate around a residential campus independently, but because it was a controlled environment it was difficult to truly assess H.P.'s visuospatial abilities. [154] ¶ 29. H.P. was in the "low average" range for learning, i.e., the speed that new visual information is learned. [55-5] at 66.

Kornacker recommended that H.P. not be given multistep directions, unless the task was familiar, and that complex tasks be broken down into small components, so that H.P. would not have to rely on his memory to complete the task. [162] ¶ 40; [55-5] at 70. She also recommended interventions to strengthen H.P.'s working memory. [162] ¶ 40; [55-5] at 72. The report noted that H.P. qualified for speech and language services due to H.P.'s significant language impairments, but that the parents requested these services "be discontinued due to poor client-therapist fit." [154] ¶ 29; [55-5] at 61. Kornacker recommended that speech and language therapy resume. [154] ¶ 29. Kornacker found that with continued support, H.P. had the capacity to engage in meaningful activities. [154] ¶ 29. She did not make an educational placement recommendation. [154] ¶ 29.

In May 2023, the parents asked the district for an emergency and student-specific residential placement. [154] ¶ 24; [162] ¶ 11. The parents sought to designate H.P.'s residential placement at Vista Life and did not request a placement level change. [154] ¶ 24; [162] ¶ 11. The parents told the district that they had applied to and H.P. had been accepted at Vista Life for the 2023–24 school year. [154] ¶ 24.[4]

In June, the district conducted another IEP team meeting to discuss the parents' emergency and student-specific residential placement request and Kornacker's report. [154] ¶¶ 25, 28, 30; [162] ¶ 41. At the meeting, the district said it would be going by the district calendar to determine H.P.'s eligibility (a shift from its earlier position about the change in Illinois law), which meant he was eligible for another year of services. [154] ¶ 25; [55-4] at 147.

The team discussed Kornacker's report. [154] ¶ 28. The district's psychologist acknowledged that Kornacker's conclusions were similar to those reached by Brietzke in 2018. [162] ¶ 42; [167] ¶ 4. The district did not conduct any evaluations of H.P. between June and August. [162] ¶ 43.

In the IEP documentation, H.P.'s "present levels of functional/developmental performance" was copied from the March IEP. [162] ¶ 46. H.P.'s house parent from

[4] Plaintiffs deny any inference that in May 2023 the district did not know that H.P. had applied to and been accepted at Vista Life. H.P. was accepted at Vista Life in October or November of 2022. [55-10] at 127 (122:2–9). N.P. says that Lauren Achurra, the district's special education department chair and off-campus program coordinator, knew the parents were pursuing Vista Life. [55-10] at 127 (123:9–11); [167] ¶ 8. He says that Achurra raised the issue that Vista Life was not qualified by the ISBE, and the parents needed to check whether there were available spots at an ISBE-approved facility. [55-10] at 127 (123:20–124:3). Achurra sent over a list of ISBE-approved facilities. [55-10] at 127 (124:3–8). The parents hired Proficio Consulting Group, a private educational consulting company, to go through the list to help. [55-10] at 128 (127:2–4); [154] ¶ 20; [162] ¶ 10.

Camphill spoke at the meeting and said that there had not been any big changes for H.P. [162] ¶ 44. The parents reiterated that the eventual goal was for H.P. to live in Oak Park and participate in an adult day program. [154] ¶ 26; [55-4] at 147.

The IEP team declined the parents' request for emergency and student-specific residential placement at Vista Life. [162] ¶ 14. It found that Vista Life was not appropriate because it was not the least restrictive environment in which H.P. could receive a free appropriate public education, it was not ISBE-approved, and it lacked licensed special education staff, related service providers, and related services and supports, especially speech therapy. [154] ¶ 38; [55-4] at 147–48.[5]

The team expressed concern about H.P.'s ability to practice generalizing his skills in the Oak Park community. [154] ¶ 38. The team also expressed concerns about the restrictiveness of residential placement. [154] ¶ 38; [55-4] at 147. The district team proposed that H.P.'s placement change from residential to the district's day-school level Community Integration Transition Education program and scheduled another IEP meeting in August to decide whether to change H.P.'s placement for the fall. [154] ¶¶ 30, 37; [162] ¶ 45. The district said the district was not "recommending residential placement for the fall" and was not looking at other residential programs. [162] ¶ 45. It offered to do additional planning and meetings over the summer until

[5] At least one of H.P.'s instructors at Vista Life was special-education certified and Vista Life was accredited by the National Commission for the Accreditation of Special Education Services and approved by the state of Connecticut for the provision of special education services. [154] ¶ 38.

H.P.'s placement at Camphill ended. [154] ¶ 30. The parents objected to the proposed placement change. [55-4] at 149.

On June 15, the parents requested a due process hearing and provided notice that they would be unilaterally placing H.P. at Vista Life in mid-July. [154] ¶¶ 39–40; [162] ¶ 15. At the time, the last agreed-upon IEP for H.P. was his March 2023 IEP, which called for residential placement. [162] ¶ 15; [167] ¶ 2.

In July, Camphill's Geiger-Martin wrote a letter on behalf of H.P., stating that a residential placement setting had been "critical for [H.P] to advance his education in all domains." [55-7] at 52. She wrote that it was important that H.P. continue to be provided a FAPE in a setting that "closely resembles the level of educational support that he currently receives otherwise he will regress in his skill set." [55-7] at 52. "Due to his lack of awareness in less familiar environments," Geiger-Martin said, "practicing activities of daily living and self-care in a naturally occurring and known environment has been critical to [H.P.]'s success and personal safety." [55-7] at 52. Geiger said that without the level of support given at a residential school setting, H.P.'s skills would regress. [55-7] at 52. She said that H.P.'s needs could only be met at a program that provided continuous 24/7 care. [55-7] at 52.[6]

[6] The district criticized Geiger-Martin's letter as self-serving and biased ("residential people tend to recommend that [students] need residential"). [162] ¶ 71. But at the time Geiger-Martin wrote the letter recommending residential placement, there was no question that H.P. was leaving Camphill and there was no spot for him there for the upcoming year. [55-7] at 52; [55-1] at 12 (¶¶ 41, 43). The letter did not serve Camphill's interests.

H.P.'s parents moved him from Camphill to Vista Life on July 25. [162] ¶ 16.[7] On July 28, they filed a motion at the administrative level to enforce statutory stay-put placement, arguing that Vista Life was H.P.'s stay-put placement. [154] ¶ 41. On August 9, the hearing officer denied the parents' motion and ordered the district to find a residential facility to implement H.P.'s IEP by August 23. [154] ¶ 41; [162] ¶ 18. On August 10, the district contacted the King's Daughters' School about placing H.P. there. [162] ¶ 19. The King's Daughter's School was an ISBE-approved residential placement facility that offered speech and social work services. [154] ¶ 50. The district also emailed the parents a list of twenty-five ISBE-approved residential facilities and provided a parental authorization form to allow the district to share information about H.P. [154] ¶ 42.[8] On August 14, the district followed up to ask again about the forms. [154] ¶ 43. The parents responded that because they were going to file a motion to reconsider the hearing officer's denial of their motion to enforce stay-put placement, they were going to "hold off on the releases" until receiving further direction from the hearing officer. [154] ¶ 43; [145-1] at 4. Later that day, the parents filed a motion for reconsideration, which the hearing officer denied.

[7] The district disputes that the parents moved H.P. directly from Camphill to Vista Life but does not cite to any evidence in the record to support its denial.

[8] The parties disagree whether the release forms were necessary. The parents say the forms were not necessary to reach out to the facilities, but the district says that the admission process could not move forward without the forms. [154] ¶ 42. In response to the parents' motion to reconsider his stay-put ruling, the hearing officer ordered the parents to sign the releases, which suggests that these forms were necessary for the process to move forward. [154] ¶ 45; [55-2] at 118.

[154] ¶¶ 43, 45. The hearing officer ordered the parents to provide signed authorizations and extended the district's deadline to secure placement. [154] ¶ 45.

On August 21, the parents returned the signed authorization forms. [154] ¶ 46. On August 23, the King's Daughters' School told the district that it presently had space but needed a parent application and potentially a call with H.P.'s current or former program to finish its review. [154] ¶¶ 46, 50; [162] ¶¶ 23–24.[9] The district told the parents about the availability and asked them to complete the parent application, with coordination from Achurra. [154] ¶ 46; [145-1] at 13.

Another IEP meeting was held on August 25. [154] ¶ 47; [162] ¶ 48. The district team members discussed CITE's programming and determined that CITE was appropriate for H.P. [154] ¶¶ 37, 47(i); [162] ¶ 48. There were no representatives from either Camphill or Vista Life at the August IEP meeting. [162] ¶ 51; [167] ¶ 5. The substance of the letter from Geiger-Martin was not discussed, and all but one of the IEP team members had not read the letter before the meeting. [162] ¶¶ 58–59; [167] ¶ 6; [55-10] at 139 (172:4–7), 139–40 (172:23–173:1). There were no clinicians who had evaluated H.P. at the meeting. [162] ¶ 51. Instead, the district psychologist submitted a report reviewing Kornacker's report and commenting that "it appears that [H.P.] has benefited from the instruction provided in his therapeutic residential setting." [162] ¶ 57; [167] ¶ 4. In drafting the IEP goals, the district did not request

[9] The district denies that there was further review needed for the King's Daughter's School to accept H.P., but the evidence shows that the school said there would be additional steps before officially accepting H.P. [55-9] at 210 ("So far, yes we think he would be appropriate. We would like to see a parent application completed and potentially have a call with his current or former program to learn more about him and see if we have any questions to conclude our review.").

information from Camphill about H.P.'s current level of functioning. [162] ¶ 52.[10] Nor did the district seek any information from Vista Life. [162] ¶ 52.[11] Instead, the current levels were once again largely copied from the March IEP. [154] ¶ 47(iv); [162] ¶ 56. The district says it considered the fact that H.P. had only one year left of eligibility when making its placement determination. [162] ¶ 55. The district claims it offered social work services to address H.P.'s emotional issues, but the parents declined the services. [154] ¶ 47(ii). The parents disagree, citing a letter from their attorney after the meeting pointing out the inaccuracies in the IEP documentation, including that the "Additional Notes/Information" section of the IEP recorded the opposite of what she had said in the meeting, and that the parents had suggested that H.P.'s language skills could be supported through social work services. [154] ¶ 47(ii). The IEP team formally changed H.P.'s placement to the district's CITE transition program. [162] ¶ 48.

The CITE program was the district's day-school program for "transition-aged students." *H.P.*, 2025 WL 641113, at *6; [154] ¶¶ 31–32.[12] It was a functional skill development and community-based transition program in Oak Park that focused on life skills and community-based activities. [154] ¶ 31. CITE students worked on skills such as daily living, including buying, preparing, and eating food, clothing

[10] The district says that it could not do so because the parents had withdrawn H.P. over a month before the meeting.

[11] The district says it was unable to obtain information from Vista Life because the parents had not signed a release but does not cite to evidence in the record supporting this contention.

[12] Plaintiffs repeatedly dispute any inference that CITE was an appropriate placement for H.P. These responses do not contradict the asserted fact and are arguments not appropriate for responses to L.R. 56.1 fact statements. *See* [154] ¶¶ 31–36.

management, managing personal finances, and managing a household; community living, like using recreational facilities and using public transportation; vocational skills; and personal living, like caring for personal needs, self-advocacy and self-awareness, communicating with others, and social awareness. [154] ¶ 31. The program also provided students with the opportunity to practice daily life skills like showering, changing clothes, brushing teeth, making the bed, cleaning, cooking, doing laundry, vacuuming, and taking the garbage out. [154] ¶ 33. CITE staff included licensed special education teachers, a prevocational education coordinator, a transition specialist, a speech language pathologist, a social worker, music therapists, an occupational therapist, and a physical therapist. [154] ¶ 34. Although CITE could provide a 1:1 aide if needed, H.P.'s August IEP did not provide for one. [162] ¶ 73. CITE offered its students both volunteer and employment opportunities in the Oak Park community. [154] ¶ 35.

CITE had 11 students in the classroom at the time of the due process hearing, some with greater needs than H.P. [154] ¶ 32; [162] ¶ 50. It operated from 8:15 a.m. to 2:30 p.m. on Monday through Friday and was closed on weekends, holidays when the district was closed, and parent-teacher conference days. [162] ¶ 49. It did not provide direct services outside of school hours. [162] ¶ 49. It provided some programming outside of school hours and conducted home visits if needed. [162] ¶ 49. Some CITE students had a disability in the category of emotional disturbance, and some students had significant behavioral issues and physical aggression. [162] ¶¶ 50, 74. Because the students' schedules were so individualized, there was a "fair amount

of coming and going" of students in the classroom. [162] ¶ 49. While the program used a rewards-based structure, behavior management could be individualized based on the family's wishes. [154] ¶ 61; [55-10] at 379 (142:4–22). And though the CITE staff had not worked with someone diagnosed with Landau-Kleffner Syndrome, H.P.'s proposed CITE teacher said she had experience working with students with seizure disorders (including current students) and speech aphasia. [55-10] at 378 (138:3–21).

On August 29, the parents told the district that they were completing the application for the King's Daughter's School but had concerns. [154] ¶ 48.

On August 30, the parents hired another provider, Dr. Kathy Borchardt, to conduct another private neuropsychological evaluation of H.P., specifically to assist in determining an appropriate educational placement and services for H.P. [154] ¶ 49; [162] ¶ 61; [167] ¶ 11; [55-10] at 88. Among other things, Borchardt "concur[red] completely" with Kornacker's assessments, interpretations, and recommendations. [162] ¶ 62; [167] ¶ 11; [55-10] at 89. She noted that H.P. exhibited a "quick forgetting rate for newly acquired skills." [55-10] at 87, 90 (H.P. struggled with recognizing whole words, likely due to quickly forgetting what he just learned), 91 (H.P. had poor recall of verbal information after just ten minutes), 92 (H.P. exhibited a quick forgetting rate in visual memory tests); [55-10] at 154 (231:4–13, 232:19–24) (H.P. needed to do tasks in a repetitive manner before he acquired the memory of it).

Borchardt found that H.P. was unable to generalize what he learned, including with cause-and-effect relationships, and so was a safety risk. [55-10] at 89. Borchardt said that while H.P. had "adopted the use of daily routines, such as navigating his

campus and dressing, and of use of community services such as exercise equipment in gym and public restrooms," he "remain[ed] significantly impaired in his receptive and expressive communication, academic skills, activities of daily living with respect to keeping a home and understanding neatness or completion of chores, in leisure planning and participation, maintaining his own health and safety, and in social skills." [55-10] at 93. In order to learn, H.P. needed "consistency in personnel and consistency in environment, consistency in routine and in schedules." [55-10] at 163 (265:2–3, 11–14); *see also* [55-10] at 93 (H.P. needed to "overlearn" work routines through social scripts and training); [55-10] at 163 (266:9–13) (H.P. needed "to be in a setting that's not changing" to increase likelihood of learning), [55-10] at 165 (273:2–11) ("transitions from say going from home to school, home to work and then back to home … increases the forgetting rate). "The more things are the same leads to more understanding and more compliance and more opportunities to incorporate what is important to learn." [55-10] at 163 (265:18–22).

Borchart noted that H.P. had "become very accustomed to residential placement in a small community living arrangement with same-aged peers for social and communication modelling." [55-10] at 94. She concluded that "to further achieve a community living goal as a component of [H.P.]'s transitional servicing, the continuation of programming within a small residential setting within which he can regularly practice (with a coach and aide) his social and communication skills is essential." [55-10] at 94.

Borchardt said that H.P. needed twenty-four-hour supervision and was more likely to incorporate what he learned and how to operate socially and on a day-to-day basis when he had "the same people, the same schedule, the same environment but in a safe place." [55-10] at 165 (273:12–16); [55-10] at 94 (it was "stressful" for H.P. to learn new ways of operating because it took "considerable mental stamina and executive functioning to overcome components of his aphasia"); [55-10] at 94 (H.P. would "likely always need a regular, highly structured routine with 24-hour oversight 7 days per week and regular cuing to initiate and complete tasks."); [55-10] at 159 (252:6–12) (H.P. needed "to learn in an environment where he's not distracted by new stimuli, where there is regularity, there is structure, there's repetition, and he needs to engage in those repeated tasks following through with somebody's demonstration of the task or modeling. He needs to engage in that a number of times."); [55-10] at 94 (once H.P. developed a routine, he would be much more likely to "behave and emote appropriately and encounter less frustration in similar environments"); *see also* [55-10] at 92 (H.P.'s distractibility interfered with Borchardt assessing H.P.'s memory for short stories).

Finally, Borchardt testified that she felt H.P. required a residential placement to support learning "[b]ecause of the very individual, specific ways of learning" that he needed, and because "the skill and his age right now and the transition into adulthood and moving into the community and his goals, it's important to minimize the transition of any kind." [55-10] at 164–65 (272:14–273:2). She found that a therapeutic day school would not be appropriate for H.P. because of "all the daily

transitions and the changeover in schedule and personnel that tends to occur frequently." [55-10] at 165 (273:17–274:2).

On September 5, N.P. submitted an application to the King's Daughter's School. [162] ¶ 25. In the application, the requested expected enrollment date was noted as October 15. [174] ¶ 3. On the same day, the parents filed this suit, seeking a statutory stay-put injunction ordering the district to maintain H.P.'s stay-put placement at Vista Life pending final disposition of the administrative due process hearing before the Illinois School Board of Education. [154] ¶ 51; [162] ¶ 26. On September 13, the King's Daughters' School invited H.P. to join the school, stating they were "anticipating an appropriate residential placement opening around the beginning of October." [154] ¶ 50; [162] ¶ 27.[13] The district forwarded the school's invitation to the parents, who rejected the placement and instead asked the district again if it would fund H.P.'s placement at Vista Life. [154] ¶ 52; [162] ¶ 30.

In November, H.P. was suspended from Vista Life for physically assaulting a Vista Life staff member. [154] ¶ 56. H.P. was allowed to return on the condition that if he continued to be physically violent toward staff, he would not be able to remain at Vista Life. [154] ¶ 56.

The due process hearing was held in December 2023. [154] ¶ 57; [162] ¶ 31. The hearing officer concluded (1) that the district denied H.P. a free appropriate public education and (2) that the parents' unilateral placement of H.P. at Vista Life

---

[13] The parents say that this confirms what they knew, because when Proficio first contacted the King's Daughters' School in April 2023, it was told that the school was "full until fall." [55-10] at 9.

was appropriate. [154] ¶¶ 65–66; [162] ¶ 32; [55-1] at 29–31. He found that the district's decision to change H.P.'s placement from residential to day school was unsupported by adequate evidence in the record. [55-1] at 29. He also found that Vista Life was an appropriate placement option for H.P. [55-1] at 31.

The hearing officer ordered the district to reimburse the plaintiffs for all costs related to H.P.'s placement at Vista Life, including tuition, room and board, and transportation, through H.P.'s twenty-third birthday. [55-1] at 32. He also ordered the district to reimburse the parents for the fees for Proficio Consulting group in finding H.P. a new placement, for the mileage expenses incurred during H.P.'s enrollment at his previous residential placement, and for the private neuropsychological evaluation completed by Borchardt before the due process hearing. [55-1] at 32–33. Finally, he ordered the district to complete a new evaluation and hold a new IEP meeting. [55-1] at 32.

Vista Life dismissed H.P. from their program in February 2024 after he physically assaulted Vista Life staff and his 1:1 aide. [154] ¶¶ 67–69; [162] ¶ 33. His parents enrolled him—once again unilaterally—at the Stables Autism Program in Tennessee the next month. [162] ¶ 33. H.P. started at Stables on March 25, 2024, and according to N.P., stayed there until September 4, 2024. [149-1] ¶ 9. The district's 2023–24 regular term ended on May 23, 2024. [162] at 37. The district did not hold an IEP meeting until June 2024. [162] ¶ 34.

## III. Analysis

### A. Due Process

The Individuals with Disabilities Education Act requires states that accept federal funding to "provide [disabled] children with an education that is free, public, and appropriate." *M.B.*, 668 F.3d at 860. A free appropriate education is one "specially designed to meet the unique needs of the" student, "supported by such services as are necessary to permit the child 'to benefit' from the instruction." *Bd. of Educ. of Murphysboro Cmty. Unit Sch. Dist. No. 186 v. Ill. State Bd. of Educ.*, 41 F.3d 1162, 1168 (7th Cir. 1994) (quoting *Bd. of Educ. of Hendrick Hudson Central Sch. Dist., Westchester Cnty. v. Rowley*, 458 U.S. 176, 188–89 (1982)). "While the IDEA does not define the particular substantive level of education that must be provided to a child, the state must provide an education that is 'reasonably calculated to enable the child to receive educational benefits.'" *K.D. ex rel. C.L. v. Dep't of Educ., Haw.*, 665 F.3d 1110, 1114 (9th Cir. 2011) (quoting *Rowley*, 458 U.S. at 206–07). The education must be delivered in the "least restrictive environment" appropriate for the student. *Ross*, 486 F.3d at 273, 277; *Beth B. v. Van Clay*, 282 F.3d 493, 497 (7th Cir. 2002).

Education under the IDEA is guaranteed for students up until their twenty-second birthday. 20 U.S.C. § 1412 (a)(1)(A); *Kass v. W. Dubuque Cmty. Sch. Dist.*, 101 F.4th 562, 567 (8th Cir. 2024) ("Brody is now twenty-two years old and past the qualifying age for a FAPE under the IDEA."). Under Illinois law, a student who requires continued public-school education is eligible for services either until their

twenty-second birthday, or, if their twenty-second birthday occurs during the school year, then through the end of the school year. 105 ILCS 5/14-1.02.[14]

A state must "determine what is uniquely 'appropriate' for each child's education by preparing an [individualized education program] developed through the joint participation of the local education agency, the teacher, and the parents." *Hjortness ex rel. Hjortness v. Neenah Joint Sch. Dist.*, 507 F.3d 1060, 1064 (7th Cir. 2007); *Ostby v. Manhattan Sch. Dist. No. 114*, 851 F.3d 677, 680 (7th Cir. 2017). The IEP is a "written statement that is developed, reviewed and periodically revised in accordance with the Act," and documents the student's "present levels of academic achievement and functional performance; provides a list of measurable annual goals; describes how the child's progress towards the goals will be measured; and presents a statement of the special education and related services to be provided to the child, among other things." *Ostby*, 851 F.3d at 680 (citing 20 U.S.C. § 1414(d)(1)(A)). "A child's placement must be based on the IEP." *Hjortness*, 507 F.3d at 1064. "Whether a school district has offered a free appropriate public education to a disabled student is a mixed question of law and fact." *Id.*

[14] The district argues that H.P. was not eligible for services for the 2023–24 school year under the Illinois School Code because both Camphill's and Vista Life's school year started after H.P.'s twenty-second birthday. But as I already found, the district's argument implies that if there were a residential serving school with a start date before H.P.'s twenty-second birthday, he was entitled to services there. *H.P.*, 2025 WL 641113, at *13. The parents say that Vista Life's school year started in March. [154] ¶ 38. If so, then H.P. would be eligible for funding until March 2024. Besides, as of the August 2023 IEP meeting, the district said it would be going by the district calendar and therefore would fund another year of services. [154] ¶ 25; [55-4] at 147. Once the parents filed the due process notice, H.P. was guaranteed a stay-put placement, which, under the last agreed-upon IEP, was a residential placement. *H.P.*, 2025 WL 641113, at *13.

If the parents of a child disagree with an IEP team's decision relating to the educational placement in an IEP, they may file a due process complaint before an independent hearing officer. 20 U.S.C. § 1415(b)(6); 34 C.F.R. § 300.507; 105 ILCS 5/14-8.02a(f); 23 Ill. Admin. Code §§ 226.570, 226.615. Any party "aggrieved by the findings and decision" of the hearing officer may sue in state or federal court. 20 U.S.C. § 1415(i)(2)(A).

At the due process hearing before the independent hearing officer, the parents contended that taking H.P.'s needs and required services as outlined in the proposed IEP, he still required residential placement, and that CITE could not meet his needs in the IEP. The hearing officer concluded that the district denied H.P. a FAPE for three main reasons: (1) the district made procedural errors, (2) the district failed to provide any current data in the June and August 2023 IEPs, and (3) the IEP developed a substantially deficient IEP both in June and August by failing to reflect changes in H.P.'s needs or disabilities, failing to include goals to address those needs, failing to include measurable goals, and failing to reflect any discussion of H.P.'s "long-standing need for a one-to-one paraprofessional." *H.P.*, 2025 WL 641113, at *8. I found that the hearing officer erred, because the parents never raised issues not directly related to whether a change in placement level met the goals of the proposed IEP. *Id.* at *9. I also found that the hearing officer made factual errors and failed to apply the correct legal test in determining whether the district provided H.P. a FAPE. *Id.* at *10–11. And I found that the school district violated stay-put until it put forward the King's Daughter's School as a residential placement for H.P. *Id.* at *14.

I ordered further motions for summary judgment to determine (1) whether the district's CITE program could implement H.P.'s last agreed-upon IEP; (2) whether Vista Life was a suitable unilateral placement; and (3) what relief is appropriate for the district's stay-put violation. [140].

#### 1. *The district denied H.P. a free appropriate public education when it changed his placement to CITE*

In determining whether the district denied H.P. a FAPE, I must determine whether CITE was "reasonably calculated to enable [H.P.] to receive educational benefits." *K.D.*, 665 F.3d at 1114 (quoting *Rowley*, 458 U.S. at 206–07); *A.M. v. New York City Dep't of Educ.*, 845 F.3d 523, 543 (2d Cir. 2017). If CITE could implement H.P.'s IEP and provide him educational benefits in the least restrictive environment, then the district did not violate the IDEA or the Illinois School Code.

Even though the hearing officer made some errors in his factual findings, many of his factual findings related to H.P.'s March, June, and August IEPs and the Vista Life, King's Daughters' School, and CITE programs were not clear error. *See* [55-1] at 3, 8 (¶¶ 23–24, 26–27, 29–38, 40–42, 44, 50–53); *H.P.*, 2025 WL 641113, at *12. I give those findings "due weight" in analyzing whether CITE could provide H.P. a FAPE—because there was no clear error, I accept them. *M.B.*, 668 F.3d at 860. Even though the hearing officer made an analytical mistake in failing to assess CITE, I may still ultimately find the facts, as found by the hearing officer, support that CITE could not provide H.P. a FAPE.

H.P.'s August 2023 IEP did not recommend residential placement for the first time since 2018. [55-4] at 157. The present levels of functional and developmental

performance were largely copied from his March 2023 IEP and reflect his time at Camphill. [154] ¶ 47(iv); [162] ¶ 56. Those present levels show how much support H.P. needed: At Camphill, although H.P. added information to his "Lifeline Binder," he struggled to identify the correct section to file certain activities and needed staff to provide two options from which he could choose. [55-4] at 160. He needed reminders to open up his calendar to the correct month, struggled to recall the day of the week, needed reminders and corrections to complete a reading passage, and needed multiple-choice responses for reading comprehension questions. [55-4] at 160–61. H.P. needed prompting to create three sentences for each activity he did while on breaks away from school, needed reminders when working on math problems, and needed reminders to stay on topic and focus. [55-4] at 161.

In terms of activities of daily living, while H.P. could list appropriate responses to safety situations, he needed options from which to choose. [55-4] at 161. He needed guidance when rinsing dishes, eating, washing his hands after using the bathroom, showering, putting clothes on, and brushing his teeth. H.P. often needed prompting, redirection, and coaching to complete tasks, be thorough, maintain focus, and maintain appropriate social boundaries. [55-4] at 162–64. He also struggled to remain motivated when he was in a bad mood or was not emotionally stable. [55-4] at 162–65.

When working in the vocational program, H.P. needed intermittent prompting, and more direction and prompting when learning a new task or struggling to

maintain focus. [55-4] at 166. The IEP reflected that H.P. needed "consistency and routine" to gain greater independence. [55-4] at 167.

In the IEP, an Oak Park and River Forest school psychologist reviewed Kornacker's report and concluded that "it appears that [H.P.] has benefited from the instruction provided in his therapeutic residential setting and that it would be appropriate for the IEP team to discuss whether or what intervention(s) continue to be necessary for him to maintain and continue his progress adaptively, socially, and emotionally." [55-4] at 169. The IEP also said that "[d]ue to the severity of [H.P.]'s disability, [H.P.] requires direct instruction in all content and elective subject areas that are not part of the general curriculum at his current grade level and the time required for such instruction will supplant time during which [H.P.] would otherwise participate in the general curriculum." [55-4] at 170.

The IEP identified that H.P. needed a predictable routine, to be informed in advance of any changes to his routine, prompts and cues, instruction in short time frames with frequent changes of activity, and a "quiet, controlled learning environment free from distractions, including but not limited to visual distractions." [55-4] at 186.

The district expressed confidence that CITE could provide the support that H.P. needed. But taking into consideration all the evidence and giving due weight to the hearing officer's credibility findings (particularly that Geiger-Martin, Kornacker, and Borchardt were credible), CITE could not provide H.P. an appropriate education.

An IEP makes a FAPE available when it is "reasonably calculated to enable a child to make progress appropriate in light of the child's circumstances." *N.T. v. Galesburg Cmty. Unit Sch. Dist. No. 205*, 174 F.4th 1044, 1058 (7th Cir. 2026) (quoting *Endrew F. ex rel. Joseph F. v. Douglas Cnty. Sch. Dist. RE-1*, 580 U.S. 386, 399 (2017)). This requires "markedly more" than "de minimis" progress. *Endrew F.*, 580 U.S. at 402. To be "reasonably calculated to enable the child to receive educational benefits," an IEP "must respond to all significant facets of the student's disability, both academic and behavioral." *Alex R., ex rel. Beth R. v. Forrestville Valley Cmty. Unit Sch. Dist. No. 221*, 375 F.3d 603, 613 (7th Cir. 2004). An IEP team must consider whether the "student's disability-related 'behavior impedes his or her learning' … in the classroom." *Id.* (quoting 20 U.S.C. § 1414(d)(3)(B)(i)).

H.P.'s IEP team determined that because of the "severity of [his] disability, [H.P.] require[d] direct instruction in all content and elective subject areas that are not part of the general curriculum at his current grade level and the time required for such instruction [would] supplant time during which [H.P.] would otherwise participate in the general curriculum." [55-4] at 95. The team explained what transition services he needed—academic and functional academic instruction, speech therapy, community experiences, development of employment and post-school adult living objectives, and acquisition of daily living skills and functional vocational evaluation. [55-4] at 102–03.

Despite what the district argues, H.P.'s impairments did require, for educational purposes, around-the-clock care. H.P. needed continuous, significant

support. His condition left him with a very fast "forgetting rate," and he needed to repeat tasks over and over to learn something. Even then, with things like brushing his teeth or washing dishes, he still needed reminders to stop or be thorough. Because of his aphasia, he was easily distracted and so needed to have an environment with fewer transitions and stimuli. H.P.'s March 2023 IEP discussed his need for consistency and his problems with short-term memory and new tasks. *See* [55-4] at 92 (H.P. "needs consistency and routine to practice his work tasks repeatedly and gain greater independence"), [55-4] at 93 (H.P.'s ability to sustain attention was weak, he had difficulty holding information in short term memory, he needed additional time to solidify concepts and would continue to have difficulty transposing learned tasks within new concepts); [55-4] at 99 (H.P. needed to "ensure a predictable routine" and a "quiet, controlled learning environment free from distractions). Borchardt's and Geiger-Martin's written support and testimony said the same.

The fewer changes that happened around him, the more H.P. could spend his mental energy learning, instead of reacting to the world around him. H.P. improved at Camphill where he had the substantial structure and routine that he required, and learned skills including functional academics, activities of daily living, life skills, and vocational skills—the precise things his IEP called for.

CITE, however, would have imposed more transitions and stimuli that could distract H.P. and divert his effort away from learning. And even then, H.P. would only get the support he needed from 8:30 to 2:30 each day. This was only 30 hours of instruction a week, 10 hours per week fewer than H.P.'s March 2023 IEP called for.

[55-5] at 99. Though there were some after-program activities, they were not every day. Because CITE was so individualized, there was a "fair amount of coming and going" of students in the classroom, adding more distractions and transitions, and disrupting the routine. [162] ¶ 49. The district says that despite this, CITE would be able to provide a structured routine for H.P. that would give him the consistency he needed. But Kornacker and Borchardt discussed H.P.'s distractibility, and even if *his* routine was consistent, each of the other CITE students would also have their own routines, and the number of "comings and goings" from the classroom would make it difficult for H.P. to remain focused. CITE also followed the school calendar and so had more holidays and breaks than residential placement—more breaks in the routine. [162] ¶ 49. To be able to learn, H.P. needed more structure, routine, and consistency than CITE could provide.

Because CITE could not provide the continuous structural support that H.P. needed to retain some educational benefit, it was not an appropriate placement for him. The district did not look for any other placement. Because the district failed to provide an adequate placement, it failed to offer H.P. a FAPE when it changed his placement from residential to its therapeutic day school.

*2. Vista Life was a suitable placement*

If the parents of a disabled child unilaterally place their child in a private placement in response to a school district's failure to comply with the requirements of the IDEA, they are entitled to reimbursement for the cost of the placement. *Patricia P. v. Bd. of Educ. of Oak Park*, 203 F.3d 462, 467 (7th Cir. 2000); *see also Sch. Comm.*

*of Town of Burlington v. Dep't of Educ. of Mass.*, 471 U.S. 359, 370 (1985) ("In a case where a court determines that a private placement desired by the parents was proper under the Act and that an IEP calling for placement in a public school was inappropriate," parents may be reimbursed as a remedy). A private school need not meet all of the IDEA's requirements for a FAPE for the parents to be reimbursed for placement there. *Doe v. Portland Pub. Schs.*, 30 F.4th 85, 92 (1st Cir. 2022); *see also Florence Cnty. Sch. Dist. Four v. Carter by and through Carter*, 510 U.S. 7, 13 (1993) (parents are not barred from reimbursement for private school where school did not meet the IDEA's definition of a "free appropriate public education"). A placement is proper under the IDEA if it is "reasonably calculated to enable the child to receive educational benefits." *Rowley*, 458 U.S. at 206–07; *see also R.L. v. Miami-Dade Cnty. Sch. Bd.*, 757 F.3d 1173, 1183 (11th Cir. 2014); *Mr. I. ex rel. L.I. v. Maine Sch. Admin. Dist. No. 55*, 480 F.3d 1, 24 (1st Cir. 2007); *Frank G. v. Bd. of Educ. of Hyde Park*, 459 F.3d 356, 364 (2d Cir. 2006); *Berger v. Medina City Sch. Dist.*, 348 F.3d 513, 523 (6th Cir. 2003) ("a unilateral private placement cannot be regarded as 'proper under the Act' when it does not, at a minimum, provide some element of special education services in which the public school placement was deficient").

Vista Life was reasonably calculated to enable H.P. to receive educational benefits. It had a transition program that provided more programming hours than H.P.'s IEP called for each week. [162] ¶¶ 12–13 (Vista Life provided 55 hours of weekly programming); [55-5] at 99 (IEP called for 40 hours of weekly instruction). It was also a residential facility, with overnight staff and after-hours support, providing

the full-time support that H.P. needed. [162] ¶ 13. It was a 365-day-a-year facility, which minimized breaks and transitions, which would allow H.P. to learn. [162] ¶ 13. Although it was not ISBE-approved, it was approved by the state of Connecticut and the National Commission for the Accreditation of Special Education Services. [162] ¶ 12.

As the hearing officer found, Vista Life was very similar to the King's Daughters' School in many respects. [162] ¶ 77. All parties agree that the King's Daughters' School could implement H.P.'s March 2023 IEP. [140]; [134] at 2. The fact that H.P. was ultimately unsuccessful at Vista Life does not mean that, at the outset, it was an improper placement for him—the same problems he encountered at Vista Life could have happened at the King's Daughters' School. And it does not mean that Vista Life was not the right placement, especially compared to the only other option: the district's therapeutic day school. *Cf. Murphysboro Cmty. Unit Sch. Dist. No. 186*, 41 F.3d at 1168 (if a school district fails to provide a child with an adequate plan, the court is unable to determine whether the parents' private placement is the least restrictive alternative because it is "the *only* alternative" (emphasis in original)). Vista Life was a proper placement under the IDEA.

Under the IDEA, a court may reimburse the parents of a child with a disability who have enrolled their child in a private school without the consent of the school district if the court "finds that the agency had not made a free appropriate public education available to the child in a timely manner prior to that enrollment." 20 U.S.C. § 1412(a)(10)(C)(ii); *see also* 34 C.F.R. § 300.148(c). The cost of reimbursement

may be reduced "upon a judicial finding of unreasonableness with respect to actions taken by the parents." 20 U.S.C. § 1412(a)(10)(C)(iii)(III); 34 C.F.R. § 300.148(d)(3). A district is not required "to pay for the cost of education, including special education and related services, of a child with a disability at a private school or facility if that agency made FAPE available to the child and the parents elected to place the child in a private school or facility." 34 C.F.R. § 300.148(a).

Under the Illinois School Code, a court reviewing an independent hearing officer's decision on whether a school district denied a student a FAPE, based on the preponderance of the evidence, shall grant such relief as the court determines is appropriate. 105 ILCS 5/14-8.02a(i).

The district did not initially make a FAPE available to H.P. when it changed his IEP to place him in its CITE program. Because of its representations to H.P.'s parents, the parents believed they had to move H.P. to Vista Life before his twenty-second birthday. Based on the district's initial belief about how to interpret the new Illinois law, it did not timely seek a new placement for H.P. before his twenty-second birthday, nor did it timely seek a new placement prior to his enrollment in Vista Life. The parents are entitled to reimbursement for H.P.'s tuition at Vista Life.

The parents say they are entitled to the full cost of Vista Life's tuition, which totaled $57,256.52. But when the district offered the King's Daughters' School as a placement, it was prepared to bring itself into compliance with the Illinois School Code and offer H.P. a FAPE. It was the parents' choice to reject the district's attempt. Although the parents had reasons for keeping H.P. at Vista Life, the district tried to

fulfill its duty to provide H.P. with a FAPE. As disruptive as it may have been to move H.P. again, now that all parties agree that the King's Daughters' School could have implemented H.P.'s March 2023 IEP, the equities do not favor reimbursing the parents for their choice. The district did find a placement, and although it could have done so sooner, found the King's Daughter's School shortly after being ordered to do so. It pushed the process forward, even when the parents did not sign release forms initially. And the district could have—and would have—paid for H.P. to remain at the King's Daughters' School pending the outcome of this litigation, had the parents moved him.[15]

Once the district came into compliance with the requirements of the IDEA (via the Illinois School Code), it was the parents' choice to stay at Vista Life, and those costs should not be borne by the district. For that reason, I reduce the amount of reimbursement for Vista Life's tuition to $24,564.52, to reflect the point at which point H.P. could have been moved to the King's Daughters' School.[16]

---

[15] Although the parents say they would have had to pay the district back for the King's Daughter's School had they lost on the merits, that is not necessarily the case. *See Ventura de Paulino v. New York City Dep't of Educ.*, 959 F.3d 519, 535 (2d Cir. 2020) ("As a practical matter, it makes sense that it is the party generally responsible for paying a student's agreed-upon educational program … who determines how pendency services are to be provided … for two reasons: (i) public funding for pendency services can never be recouped; and (ii) the cost of educational services can vary dramatically."). And their assessment of the litigation risks is not material to whether any school provided an appropriate education for H.P.

[16] The IDEA funded H.P.'s education until his twenty-second birthday. 20 U.S.C. § 1412(a)(1)(A); *Kass*, 101 F.4th at 567 ("Brody is now twenty-two years old and past the qualifying age for a FAPE under the IDEA."). After that point, the Illinois School Code provided for his education through the end of the school year. 105 ILCS 5/14-1.02; *H.P.*, 2025 WL 641113, at *7.. As discussed below, issues over how the district will find the money to reimburse the parents for the costs the district inflicted on them are not reasons to reduce the district's liability.

The parents spent their own money to hire a consulting firm to find a suitable placement for H.P. once they knew that H.P. could not return to Camphill in the fall of 2023. But it was the district's responsibility to find H.P. a placement where he could receive a FAPE. Because the parents took on the district's responsibility to find H.P.'s next placement, they should be reimbursed for the expenses of hiring Proficio to find H.P. a placement for fall 2023. The district is ordered to pay the parents $3,500.00 in reimbursement for Proficio's costs.

The parents seek repayment for Dr. Borchardt's evaluation. Parents of a child have the right to "obtain an independent educational evaluation of the child" at the public expense. 34 C.F.R. § 300.502. The district is ordered to pay $2,750.00 for Borchardt's evaluation.

The district is also ordered to pay the costs of transportation for H.P. at Vista Life until October 1, 2023, as a remedy for its failure to provide H.P. a FAPE. *See* 20 U.S.C. § 1411(a)(1) ("The Secretary shall make grants to States … to assist them to provide special education *and related services* to children with disabilities) (emphasis added); 20 U.S.C. § 1401(26)(A) ("The term 'related services' means *transportation*, and such developmental, corrective, and other supportive services … as may be required to assist a child with a disability to benefit from special education.) (emphasis added). The district must pay the parents $1,429.00 in travel expenses related to Vista Life.

I agree with the district that the additional reimbursement awarded by the hearing officer for travel to Camphill was outside the issue presented at the hearing.

The plaintiffs offered the evidence of Camphill travel costs at the hearing for a limited purpose: to show the frequency of travel. [55-10] at 120. And while the hearing officer had broad equitable discretion to afford relief, I conclude that the Camphill travel was not sufficiently related to the denial of a free appropriate public education in changing H.P.'s placement and should not be awarded as relief for the district's violation here.

In total, the district is ordered to reimburse the parents $32,243.52 for violating H.P.'s right to a FAPE.

### B. Stay-Put

The question of stay-put is a separate one from the merits of whether the district denied H.P. a FAPE. *H.P.*, 2025 WL 641113, at *14 (citing *Ostby*, 851 F.3d at 685; *Tina M. v. St. Tammany Parish Sch. Bd.*, 816 F.3d 57, 60 (5th Cir. 2016)). I previously found that the district violated the stay-put injunction when it did not initially find a residential placement for H.P. once it knew he could not return to Camphill. I ordered additional briefing on the scope of the remedy.

When a parent requests a due process hearing, unless the district and parents agree, the student "shall remain in the then-current educational placement of the child." 20 U.S.C. § 1415(j); 105 ILCS 5/14-8.02a(j) ("During the pendency of any administrative or judicial proceeding conducted pursuant to this Section … the student shall remain in his or her present educational placement and continue in his or her present eligibility status and special education and related services, if any."). This provision operates as an "automatic preliminary injunction." *K.D.*, 665 F.3d at

1117.[17] The stay-put provision "maintains the status quo of the child's placement *until the complaint has been fully resolved*." *Ostby*, 851 F.3d at 681 (emphasis added). This requires the school district to continue to pay for the "then-current educational placement" until the complaint is fully resolved. *Rena C. v. Colonial Sch. Dist.*, 890 F.3d 404, 415 (3d Cir. 2018).

Where the parents have challenged a proposed placement that is pending when stay-put relief is sought, the "then-current educational placement" is typically "the child's last agreed-upon educational program before the parent requested a due process hearing to challenge the child's" placement. *Ventura de Paulino v. New York City Dep't of Educ.*, 959 F.3d 519, 532 (2d Cir. 2020). The last agreed-upon IEP here was the March 2023 IEP, which called for residential placement. [162] ¶ 15; [167] ¶ 2.

*1. Vista Life*

Until early October, when H.P. could have begun to attend the King's Daughters' School, the district did not have a suitable stay-put placement for H.P. The parents rejected the district's offer and instead opted to keep H.P. at Vista Life. The parents seek reimbursement for H.P.'s tuition and expenses related to his placement at Vista Life for the entire period H.P. remained there, or, in the alternative, for the period from when H.P. was first moved to Vista Life until early October 2023, when he could have enrolled at the King's Daughters' School.

---

[17] To the extent the district implies that the parents were required to seek a stay-put injunction, it is incorrect. [154] ¶ 40. Stay-put is automatic upon the filing of a due process request. *K.D.*, 665 F.3d at 1117.

The district once again argues that H.P. withdrew from the district to attend a post-secondary program, and so the parents are not entitled to any reimbursement. H.P. did not withdraw from the district; he was forced to leave his current placement because of the district's actions. The district cannot fault the parents' choice when it initially failed to put forth any option for H.P. at a residential facility pursuant to the stay-put injunction. *Cf. Murphysboro Cmty. Unit Sch. Dist. No. 186*, 41 F.3d at 1168 (if a school district fails to provide a child with an adequate plan, the court is unable to determine whether the parents' private placement is the least restrictive alternative because it is "the *only* alternative." (emphasis in original)). The district cannot complain because "this situation resulted directly from the school district's failure to present a viable alternative." *Id.*

Because the district failed to put forward a stay-put placement until September, and the placement would not go into effect until October, I find that the parents are entitled to reimbursement for Vista Life's tuition and expenses until October 2023.

The parents also seek reimbursement for the period after they turned down the King's Daughters' School until H.P. left Vista Life. The parents stipulated that King's Daughters' School was an appropriate stay-put placement. *See* [140]; [134] at 2. So, under the IDEA and Illinois School Code, the parents are not entitled to reimbursement for their placement at Vista Life after H.P. could have enrolled at King's Daughters' School. I have broad discretion to grant such relief as I deem appropriate, and so, even though the parents are not entitled by law to

reimbursement for Vista Life, the parents argue I should reimburse them. 105 ILCS 5/14-8.02a(i) (district court may "grant such relief as the court determines is appropriate"). For the same reasons that I reduce the parents' award for the district's due process violation, I decline to extend the district's liability for its violation of the stay-put placement after it offered King's Daughter's School. The district substantially came into compliance with the stay-put injunction and remedied its earlier violation. It was the parents' decision to reject the remedy. The parents are entitled to a total of $29,493.52 to remedy the stay-put violation. This includes the cost of Vista Life's tuition and travel expenses from July to October and reimbursement for Proficio's services.[18]

*2. Stables*

I decline to award reimbursement for Stables or the associated costs of finding a placement at Stables.

In passing the IDEA's stay-put provision, Congress intended "to strip schools of the *unilateral* authority they had traditionally employed to exclude disabled students." *Honig v. Doe*, 484 U.S. 305, 323 (1988) (emphasis in original). "A stay-put injunction runs only against the school district because it is intended to shield against a *school district's* unilateral attempt to change a student's placement." *Davis on behalf of Davis v. D.C.*, 80 F.4th 321, 327 (D.C. Cir. 2023) (emphasis in original). Stay put is a "shield to temporarily block the District from fundamentally changing a

[18] The parents do not include Camphill's travel expenses or the costs of Borchardt's report in their request for reimbursement for the district's stay-put violation. [170] at 18.

student's educational placement; it is not a sword to effectuate affirmative remedies." *Id.* at 328–29 (internal quotation marks and citation omitted). It was not the district's decision to change H.P.'s placement when Vista Life expelled H.P. The parents effectively withdrew from the district at the point they rejected the King's Daughters' School, even if they had their reasons for doing so. The district no longer had an obligation to maintain stay-put, and so it is not equitable to order it to pay for H.P.'s placement at Stables and the parents' expenses to find it.

To the extent the parents assert a new claim for a denial of a FAPE by the district's failure to find H.P. a new placement when he was dismissed from Vista Life, that is beyond the scope of the case before me. Even if the district did not suggest another placement, and in doing so, denied H.P. a FAPE for the remainder of the school year, I still must make a finding that Stables was appropriate to order reimbursement for the parents' expenses. The parties do not present any substantive facts or evidence about the Stables program and whether it was proper under the IDEA standards. I decline to reimburse the parents for Stables on this record.

**C. State Mandates Act**

The district again argues that the expansion of local services without funding violates the State Mandates Act, 30 ILCS 805/8(a). *See H.P.*, 2025 WL 641113, at *16 n.13. Where a bill mandates that services be expanded by a local government, the bill also must have an appropriation to fund the expansion through reimbursement unless there is a statement in the bill excluding reimbursement liability. 30 ILCS 805/6(f). "[T]he failure of the General Assembly to make necessary appropriations

shall relieve the local government of the obligation to implement any service mandates … unless the exclusion provided for in this Section are explicitly stated in the Act establishing the mandate." 30 ILCS 805/8(a).

As I noted earlier, *H.P.*, 2025 WL 641113, at *16 n.13, the Illinois School Code does not provide for a companion appropriation bill to make up for the additional costs of funding H.P.'s education through the end of the school year in which he turned twenty-two. But it seems that the state provides for some reimbursement. Frequently Asked Questions: Public Act 102-0172 and Public Act 102-0174, at 5–6 (rev. 2021).[19] And in any event, the Illinois School Code gives broad discretion to "grant such relief as the court determines is appropriate." 105 ILCS 5/14-8.02a(i).

The district erred in its handling of H.P.'s placement and it should bear the costs of those mistakes. Where it finds the money to pay for the education it owed to H.P. (but did not provide) is immaterial. H.P. is entitled to relief. And with the district's own concession at the August 2023 IEP meeting that it would be going by the district calendar and offering H.P. another year of services, [154] ¶ 25; [55-4] at 147, equity favors holding the district to its promise until the parents rejected it.

## IV. Conclusion

The motions for summary judgment, [144] and [147], are granted in part and denied in part. The district is ordered to reimburse the parents $32,243.52 for expenses related to H.P.'s placement at Vista Life from July 2023 to October 2023.[20]

---

[19] Available at https://www.isbe.net/Documents/FAQ-HB-40-HB-2748.pdf.

[20] The total award eliminates any double recovery for reimbursements applicable to both the stay-put and due-process remedies.

Enter judgment in favor of plaintiffs and against defendant in the amount of $32,243.52, and terminate civil case. The parties shall comply with Local Rule 54.3 for any fee petition.

ENTER:

Manish S. Shah
United States District Judge

Date: August 31, 2026